[No. A134480. First Dist., Div. Five. Dec. 16, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCELLOUS LEWIS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.–D.

## COUNSEL

Shannon Chase, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NEEDHAM, J.**—Marcellous Lewis (Lewis), a juvenile at the time of his offenses but tried as an adult, appeals from a judgment of conviction and sentence after a jury found him guilty of the sexual penetration and rape of one victim, the rape of a second victim, and the murder of a third victim. Lewis contends (1) the court should have granted his motion to sever the rape and other sexual assault charges from the murder charge; (2) the court did not adequately investigate possible juror bias; (3) the prosecutor committed misconduct in his discussion of provocation during closing argument; (4) the sexual penetration and rape of one of the victims were not separate acts, and the court therefore should not have imposed consecutive terms for the corresponding offenses; and (5) his sentence of 115 years to life violates his constitutional right against cruel and unusual punishment.

In the published portion of this opinion, we conclude that Lewis's sentence is unconstitutional and the matter must be remanded for the trial court to determine a parole eligibility date within Lewis's expected lifetime, unless it concludes that his offenses reflected such irreparable corruption that it is appropriate to preclude him from the possibility of parole during his lifetime. In all other respects, we will affirm the judgment, as we conclude in the nonpublished portion of the opinion that Lewis's remaining arguments are unavailing.

## I. *FACTS AND PROCEDURAL HISTORY*

In November 2009, the court granted the prosecution's motion to consolidate two complaints against Lewis: a complaint charging him with the kidnap, sexual penetration, and rape of Jane Doe 1 and the kidnap and rape of Jane Doe 2, and a complaint charging him with the murder of Robert Tibbs (Tibbs).

In May 2010, the court held Lewis, a minor at the time of the crimes, to answer to the charges as an adult. (Welf. & Inst. Code, § 707, subd. (d).)

In September 2011, Lewis was charged in an amended information with the following: in count one, the murder of Tibbs (Pen. Code, § 187, subd. (a));[1] in count two, sexual penetration with a foreign object upon Jane Doe 1 (§ 289, subd. (a)(1)); in count three, rape of Jane Doe 1 (§ 261, subd. (a)(2)); and in count four, rape of Jane Doe 2 (§ 261, subd. (a)(2)). In connection with the murder count, the information alleged that Lewis had personally and intentionally discharged a firearm and caused great bodily injury and death. (§§ 12022.53, subds. (b)–(d) & (g), 12022.7, subd. (a).) As to the sexual assault counts, the information alleged that Lewis kidnapped his victims, and perpetrated offenses against multiple victims, within the meaning of the one strike law (§ 667.61).

By motion in limine, Lewis sought an order severing the sexual assault counts from the murder count. As discussed *post, the court denied the motion.*

The matter proceeded to a jury trial.

### A. *Prosecution Case*

At trial, victim Jane Doe 1 was referred to as Crystal Doe (Crystal), and victim Jane Doe 2 was referred to as Sabrina Doe (Sabrina). According to the prosecution, Lewis digitally penetrated and raped Crystal, raped Sabrina, and shot and killed Tibbs, all before he turned 18 years old.

#### 1. *2006 Digital Penetration and Rape of Crystal*

Crystal met Lewis in 2005 or 2006. As of October 2006, she was 16 years old and he was 15 years old. Crystal was a virgin.

Crystal testified that she received a call from Lewis in the afternoon of October 2, 2006, as she was walking with her friend Malysa. When Lewis asked Crystal to go to his house, Crystal declined but agreed to meet him at a church at "East 21st and 21st Ave." Malysa went home.

Crystal met Lewis at the front steps of the closed church. When Crystal saw her brother drive by, Crystal and Lewis moved to the side steps of the

---

[1] Except where otherwise indicated, all statutory references are to the Penal Code.

church at Crystal's suggestion, because she thought she would be in trouble if her parents learned that she was with a boy.

After Lewis and Crystal talked for a while at the side of the church, Lewis put his hand on Crystal's lower back. Crystal told him to stop; Lewis stopped "for a minute" but then resumed. Although Crystal attempted to push Lewis's hand away, Lewis tried to put his hand farther down her back, into her pants. Crystal told him, "no."[2] Feeling unsafe, Crystal stood up and tried to pull a box cutter out of her back pocket, intending to cut Lewis, but the box cutter slipped from her hand.

While Lewis and Crystal were on their feet near a cross, Lewis held Crystal's pants by the belt loop with one hand, forced his other hand inside her pants, and inserted one or more of his fingers into her vagina. Crystal felt pain and told him "no" and "stop." She tried to pull Lewis's hand out of her pants, but he just dug deeper. She kept telling him to stop, but he persisted.

Lewis kept his finger or fingers inside Crystal's vagina as he pushed or pulled her, against her will, approximately 33 feet through a gate, down a walkway, and behind the church between two windows. He then pushed her against the wall of the church, held her by her pants, and tried to bend her over as she faced the wall. By this time, Crystal's pants and underwear had come down part way. Lewis announced that he was going to "stick it in from the back," and Crystal replied, "no." Lewis tried to insert his penis into her vagina from behind and said: " '[Y]ou know you want it. Just let me put it in.' " Crystal said "no" and told him to stop; refusing to spread her legs, she was able to prevent him from forcing his penis into her vagina.

Crystal continued to struggle with Lewis, ending up on her back on the ground. Ignoring Crystal's continued pleas to stop, Lewis pinned her down, lowered her pants and underwear, and inserted his penis into her vagina.

After Lewis stopped his assault, he walked away laughing and called her "bootsy," which is slang for "lame." Crystal texted Malysa that she had just been raped.

At home, Crystal went to the bathroom and felt a burning sensation when she urinated. She also saw blood, apparently coming from her vagina, on her underwear. Crystal burst into tears and told her mother that Lewis had raped her. Crystal's mother called police.

---

[2] At this point, Crystal was on the phone with Malysa. Malysa confirmed at trial that she heard Crystal twice say to someone, in a serious voice, "[N]o, stop, don't."

Crystal was transported to Highland Hospital, where a "SART" (sexual assault response team) examiner found genital injuries consistent with sexual assault. Crystal's pants and underwear were collected as evidence.

The police investigation proceeded over the next two years. In October 2006, Crystal was interviewed by police. In June 2007, the SART kit was submitted for analysis. That same month, Lewis told police he did not have sex with Crystal or anyone behind a church, and he allowed the police to take a DNA sample. In August 2008, Lewis's DNA was matched to DNA collected from Crystal's underwear.

The police presented Crystal with a photographic lineup in September 2008. She pointed to Lewis's photograph, but was tentative about the identification because, she claimed, she was reluctant to relive the incident. Crystal subsequently identified Lewis at the preliminary examination and at trial.

### 2. *2007 Rape of Sabrina*

Sabrina testified that after midnight on August 26, 2007, she was waiting for friends outside their Oakland apartment building, when she was grabbed from behind. She tried to hit her assailant with her purse and told the attacker to let her go. A male voice replied, "We could do it the easy way or the hard way." Sabrina was frightened.

The man dragged Sabrina by her hair about four blocks to a dark isolated area in a park, as she struggled and continued to ask him to let her go. He pushed her onto a picnic table, so that her head was on the table and her knees were on the bench. He unbuttoned her pants and pulled down her pants and underwear. She kept saying "no" and was afraid she was going to die. He inserted his penis into her vagina, rubbed her breast, and tore her shirt. After moving his penis back and forth inside her vagina, he released his grip on her and she ran away. The attacker warned Sabrina that if she told anybody, he would hurt her friends, whom he named.

Sabrina nonetheless reported the rape to her friends. They took her to Highland Hospital, where she underwent a sexual assault examination and her clothes were collected as evidence. An examiner found bruises to her arm and thigh and blunt trauma to her vaginal opening—injuries that he opined would not normally be caused by consensual intercourse.

The SART kit in Sabrina's case was submitted for DNA analysis in September 2007. Ultimately, the 2008 DNA analysis matching Lewis's DNA

sample to Crystal's SART kit sample provided a "cold hit" in Sabrina's case: Lewis was the major sperm donor in two samples from Sabrina's underwear.

### 3. *2008 Murder of Tibbs*

Tibbs, a Navy veteran and substance abuse counselor at a church, lived in a ground-floor apartment in East Oakland with his fiancée, Pamela Davis (Davis), along with their daughter and Davis's other two children. According to Davis and Davis's sister, Tibbs was "laid back" and neither threatening nor aggressive.

Davis testified about her dog, which Lewis claimed he wanted to see on the night of Tibbs's murder. She explained that, in 2007, a man named Carl Williams (Williams) had kept a pit bull in the backyard of a nearby abandoned house. In early December 2007, Davis asked to have the dog after it was nearly hit by a car, and Williams agreed. The next day, Williams was killed. Davis and Tibbs kept the dog in their apartment and named it "Cinnamon." In the ensuing months until May 2008, Lewis never asked to see the dog or went to Davis's apartment to visit it. Nor did he ever claim that it was his dog.[3]

On the night of May 21, 2008, Tibbs was in the apartment studying for his college final exams, while Davis was in another state. Tibbs was just three weeks away from graduation; the day before, he had celebrated his 41st birthday. But sometime after 11:00 p.m. on May 21, Tibbs declined to turn Cinnamon over to Lewis, and Lewis ended Tibbs's life.

Charles Berry, Tibbs's next-door neighbor, testified that he awoke to the sound of gunfire around 11:10 p.m. on May 21, 2008. Berry then heard "some glass being broken." About two minutes after hearing the first gun-shots, he heard two or three more. Berry called 911 after hearing the first shots and later spoke to 911 a second time. Looking out his window, he saw a Black male walking towards the street on Tibbs's side of the fence that divided their properties.[4]

---

[3] Davis and Tibbs's neighbor, Charles Berry, confirmed at trial that Davis and Tibbs kept the dog in their apartment, he never saw Lewis with the dog, and Lewis never claimed it was his dog.

[4] Computer aided dispatch (CAD) records indicated that Berry called 911 at 11:13 p.m.; the call was disconnected and 911 returned the call at 11:13 p.m. and 11:14 p.m. Transcripts of these calls indicated that Berry thought there had been two gunshots. At trial, Berry clarified that he heard "at least two" gunshots. Berry also provided police with a written statement, which asserted he awoke to the sound of a gunshot around 11:15 p.m.; about 10 seconds after the first gunshot, he heard glass break; about five seconds later he heard a second gunshot; about a minute after that, he looked out the window and saw a Black male and female.

LaTonya Lee, Tibbs's upstairs neighbor, testified that she was in her bedroom and also heard gunshots shortly after 11:00 p.m. She called 911 (at 11:10 p.m., according to the CAD report). While she was on the 911 call, she heard glass breaking; she also heard a loud male voice that she did not recognize. When she heard another gunshot, she called the police again. Lee peeked out her window and saw someone with "long dreads" standing on the curb and walking between her apartment building and Berry's fence. She heard a woman near the street say " 'come on' " more than once.

Around this time, Davis and her sister received a call from Tibbs, saying that Lewis was outside, " 'shooting up the house to get the dog.' " Multiple gunshots, sounding like they were coming from outside the apartment, could be heard in the background. Davis's sister told Tibbs to call 911.

At 11:12 p.m. and 11:14 p.m., 911 dispatch logged hang-up or incomplete calls from Davis's apartment phone. At 11:16 p.m. and 11:20 p.m., Tibbs connected with 911 and reported that Lewis had shot him in the chest.

Police officers arrived at the apartment at approximately 11:20 p.m. Through a broken window, they observed Tibbs on the kitchen floor, bleeding and moaning. Officers forcibly entered the apartment through the locked front door at 11:22 p.m.

Tibbs was transported to Highland Hospital, where he died at 11:55 p.m. An autopsy found a gunshot wound to the right side of his chest.

At 11:56 p.m., Lewis and his girlfriend, Dominique Pierson, also arrived at Highland Hospital. Lewis claimed he was shot in the right hand, but his only wounds were two very "superficial" lacerations, consistent with cuts from a sharp object such as glass; the treating physician testified it was unlikely that the wounds were from a gunshot or a machete blade.

In a statement given to the police the day after the shooting, Pierson told officers that Lewis had been arguing with a man (Tibbs) about a dog. Lewis said, " 'I want my fucking dog' " and " 'Give me my fucking dog.' " Tibbs said, " 'Get the fuck out of here,' " " 'Get the fuck from in front [of] my door,' " " 'This ain't your dog,' " and " 'Ain't no dog here.' " When Pierson tried to persuade Lewis to leave, he told her to " '[s]hut the fuck up, bitch.' " Near the apartment door, Lewis said, " 'You gonna play with me[?]' 'I want my fucking dog.' " " 'You, ain't gonna bring my dog outside?' " By this point, Lewis had pulled out a gun. As Pierson walked away, she heard two gunshots. Lewis later ran up to her, saying, " 'He shot me. He shot me in my

arm,' " but Lewis's hand, not his arm, was bleeding, and his hand did not look like it had been shot. Pierson and Lewis then took a bus to the hospital.[5]

Officers inspected the scene at Tibbs's apartment building. Glass from the broken kitchen window, near where Tibbs would customarily study, was both inside and outside the apartment. One bullet casing was found on Berry's driveway (on the other side of the fence from Tibbs's residence), in the general vicinity of the broken window. A second casing was found in the inside track of the broken kitchen window, consistent with a gun being fired from within the window frame.

A rusted machete that Davis kept in the kitchen was found on the ground by a walkway outside, near the broken window; small pieces of shattered glass were around the machete, but the machete had no blood on it. Strike marks consistent with the machete blade were inside the apartment above the broken window and on top of a nearby fish tank, which did have blood on it. Police did not find a gun inside the apartment, and Tibbs did not own one.

Outside the apartment, a trail of blood led to a bus stop. Forensic analysis determined that it was Lewis's blood on the glass from the broken window and on the ground outside the apartment.

The gun used to shoot Tibbs was never recovered, but police found photographs of guns on Lewis's cell phone, including a semiautomatic pistol of the same caliber as the recovered casings.

According to an investigator, Tibbs was inside the apartment, close to the window, when he was shot. Tibbs left strike marks on the inside of the window (with the machete) while Lewis was at the window.

### 4. October 2008 Police Interview with Lewis

On October 15, 2008, Lewis was in custody in juvenile hall for the Tibbs murder. After waiving his rights, he spoke to detectives investigating the rapes of Crystal and Sabrina. Shown a photograph of Crystal, Lewis said he had not had sex with her, or that he did not remember for sure because "[he] done has [sic] sex with a whole lot of girls." Shown Sabrina's photograph, Lewis denied dating her, talking to her, or knowing her.

---

[5] At trial, Pierson was less forthcoming. She testified that she and Lewis had consumed alcohol and Ecstasy on the day of the shooting. She heard Lewis and the other man arguing about a dog, and Lewis sounded a little upset. Lewis had a gun. At some point she said, " 'let's go' " and heard gunshots. She then saw that Lewis's hand was bleeding, and they went to the hospital.

### B. *Defense Case*

Lewis's mother, Alicia Grayson, testified that Williams had been like an older brother to Lewis and was important in his life because Lewis's father had died before Lewis was born. Lewis helped feed and walk the dog that Williams had kept at a vacant house. When Williams was shot to death (attempting an armed robbery) in December 2007, Lewis "cried like a baby" and became depressed. She later suspected that Lewis started taking Ecstasy, noting his behavior had changed in that he "moved fast" and "talked fast."

In the afternoon of May 21, 2008, Grayson saw Lewis and Pierson on the street where Tibbs lived. Lewis was "moving fast," "speeding," and not staying still. He saw a newspaper article listing the people killed in Oakland during 2007, including Williams. Grayson left the area around dusk.

### C. *Jury Verdict and Sentence*

The jury acquitted Lewis of first degree murder, but found him guilty of second degree murder. The jury also found Lewis guilty of the sexual penetration and rape of Crystal and the rape of Sabrina. In addition, the jury found true the enhancement for personal use of a gun with respect to the count one murder charge, as well as the allegations of multiple victims and kidnapping as to the sexual offense counts.

Lewis was sentenced to a term of 115 years to life in state prison, comprised of 15 years to life for the murder of Tibbs; a consecutive 25 years to life for the firearm enhancement; and a consecutive 25 years to life for each of the three sexual assault crimes (penetration of Crystal, rape of Crystal, and rape of Sabrina), pursuant to the one strike law (§ 667.61).

This appeal followed.

## II. *DISCUSSION*

We address Lewis's contentions in turn.

### A.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### E. *Eighth Amendment*

Lewis was sentenced to 115 years to life, comprised of 75 years to life for nonhomicide offenses (25 years to life for each of the digital penetration and

---

*See footnote, *ante,* page 108.

rape offenses) and 40 years to life with respect to the homicide offense (15 years to life for second degree murder and 25 years to life for the gun use enhancement). He contends the sentence violates the Eighth Amendment prohibition against cruel and unusual punishment, because it effectively constitutes a sentence of life without the possibility of parole (LWOP).

### 1. *Law*

■ An LWOP sentence may not be imposed against a juvenile offender for nonhomicide offenses. (*People v. Caballero* (2012) 55 Cal.4th 262, 268 [145 Cal.Rptr.3d 286, 282 P.3d 291] (*Caballero*) ["sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment"]; *Graham v. Florida* (2010) 560 U.S. 48, 82 [176 L.Ed.2d 825, 130 S.Ct. 2011] (*Graham*) [federal Constitution categorically bans the "imposition of a life without parole sentence on a juvenile offender who did not commit homicide"].) The court in *Caballero* explained: "Although proper authorities may *later* determine that youths should remain incarcerated for their natural lives, the state may not deprive them *at sentencing* of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Caballero, supra*, 55 Cal.4th at p. 268, italics added.) In so holding, *Caballero* ruled that a cumulative sentence for distinct crimes, imposing a total term of imprisonment in excess of the offender's life expectancy, is the functional equivalent of an LWOP sentence even if each of the sentences comprising the aggregate, standing alone, included the possibility of parole within his lifetime. (*Id.* at pp. 267–268.)

As to homicide offenses, the United States Supreme Court has held that a state may not impose a *mandatory* LWOP sentence on a juvenile offender, although the sentencing court might impose such a sentence if it has adequately considered the offender's age and environment and found " 'irreparable corruption.' " (*Miller v. Alabama* (2012) 567 U.S. ___, ___–___ [183 L.Ed.2d 407, 132 S.Ct. 2455, 2468–2469] (*Miller*) [noting LWOP sentence for a juvenile offender would be "uncommon" and imposed against the " 'rare juvenile offender whose crime reflects irreparable corruption' "]; see *Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.)

### 2. *Analysis*

Lewis contends the 75-year-to-life sentence for nonhomicide offenses is unconstitutional under *Caballero*. He also contends his 115-year-to-life aggregate sentence is unconstitutional, because 115 years to life is the functional equivalent of an LWOP sentence, the sentence was mandatory under the

sentencing scheme (once the court decided that the one strike law offenses occurred on separate occasions), and the sentencing court did not consider Lewis's youth, background, and other circumstances as *Miller* requires. Respondent urges that, even if Lewis received the functional equivalent of an LWOP sentence, the court did consider Lewis's youth and background, concluding that those factors actually pointed towards greater punishment.[8]

### a. *Lewis's sentence is a de facto LWOP*

Lewis's 115-year-to-life aggregate sentence, and even the 75-year-to-life component for his nonhomicide offenses, constitutes an effective LWOP. Given his presentence credits of 982 days, and assuming in-prison work credits at 15 percent (§§ 2933.1, subd. (a), 667.5, subd. (c)), Lewis would not be eligible for parole on his 75-year-to-life sentence for roughly 63 years, when he would be approximately 84 years old. Lewis contends his life expectancy is just 64.5 years, based on a table from the Centers for Disease Control and Prevention; respondent counters that Lewis's remaining life expectancy at the time of sentencing was 57.82 years, according to a different table, which would give him a total life expectancy of 78 years. Under either calculation, Lewis would not be eligible for parole within his natural life expectancy, so his aggregate sentence for nonhomicide offenses constitutes the functional equivalent of an LWOP sentence. (See *Caballero, supra*, 55 Cal.4th at pp. 268–269 [110 years to life for three attempted murders, plus enhancements, placed parole eligibility outside his normal life expectancy]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 63 [114 Cal.Rptr.3d 870] [where life expectancy of 18-year-old defendant was 76 years, and eligibility for parole was at age 88 (after taking into account presentence credits and in-prison credits), sentence was " 'materially indistinguishable' " from LWOP ].) And since 75 years to life would be an effective LWOP for Lewis, so would his aggregate 115-year-to-life sentence.

---

[8] Before sentencing Lewis, the court told him: "None of these people had done anything to you. You're just a mean, cold person. I don't know how you got that way. You said you were deeply affected by the murder of your brother and your cousin, but instead of trying to do something better, you cause more viciousness and more heartache to this community and to these people. [¶] You deserve the same amount of consideration that you gave those three human beings—none." This finding did not, however, comply with *Miller*: (1) *Miller* was decided after Lewis was sentenced, so the trial court could not have had *Miller* in mind; (2) when the court discussed Lewis's background, it was not in the context of whether Lewis could be sentenced to LWOP; and (3) although the court was aware of Lewis's youth, the court did not substantially discuss it when meting out his sentence. (See *Miller, supra*, 567 U.S. at pp. ___–___ [183 L.Ed.2d 407, 132 S.Ct. at pp. 2468–2469]; *Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.)

### b. *Application of* Caballero *and* Miller

The question becomes what analysis should be applied where, as here, the court has consecutively imposed both a de facto LWOP sentence for nonhomicide offenses, *and* a sentence for a homicide offense and related enhancement. The categorical ban of LWOPs and de facto LWOPs in *Graham* and *Caballero* applied to sentences that were for nonhomicide offenses only. The possibility of imposing an LWOP upon an offender of "irreparable corruption," as discussed in *Miller*, applied to an actual LWOP sentence for a homicide offense only. Does the fact that Lewis committed a homicide in addition to his nonhomicide offenses mean that the court might impose a de facto LWOP upon the type of finding embraced by *Miller*, even though it was Lewis's nonhomicide offenses for which he received the de facto LWOP? Or does the absolute ban on de facto LWOP sentences under *Caballero* apply in California even though Lewis also committed a homicide?

One approach to this mixed-sentence situation—which the People supported at oral argument on the ground that *Caballero* did not address a homicide offense and *Miller* addressed only a homicide offense—is to apply *Caballero* and *Miller* to their corresponding parts of the sentence: that is, analyze the portion of the sentence attributable to nonhomicide offenses under *Caballero*, and analyze the portion of the sentence attributable to the homicide offense under *Miller*. Under this approach, we would find Lewis's sentence unconstitutional under *Caballero*, because it imposed an effective LWOP for nonhomicide offenses. We would not need to reach the constitutionality of the portion of the sentence imposed with respect to the homicide; but if we did, we would find this aspect of the sentence constitutionally permissible anyway, because 40 years to life is not an effective LWOP. Accordingly, we would vacate the sentence and remand for the court to set a probation eligibility date within Lewis's natural lifetime, as described in *Caballero*. (*Caballero, supra*, 55 Cal.4th at pp. 268–269.)[9]

A second approach, which Lewis supported to some extent at oral argument, is to apply *Caballero* and *Miller* to the sentence *as a whole*. Because there was a homicide, the court could first determine whether the juvenile's offenses reflected irreparable corruption. If they did, the court would impose the de facto LWOP (since *Miller* would allow an actual LWOP for such a defendant who committed a homicide, certainly it would allow a de facto LWOP for such a defendant who committed a homicide and additional crimes); if Lewis's offenses did not reflect irreparable corruption, the court

---

[9] Arguably, Lewis's parole eligibility date would not be earlier than the parole eligibility date he would receive on his 40-year-to-life sentence, since that sentence as to his homicide-related offense is not an effective LWOP and is not constitutionally infirm. We need not address that question, since the sentencing court has not set a parole eligibility date.

would have to set a probation eligibility date within the juvenile's expected natural lifetime. Under this approach, since the sentencing court in this case did not find or even consider whether Lewis's offenses reflected irreparable corruption, we would remand for the *Miller* determination and, if no *Miller* finding is made, the court would establish a parole eligibility date within Lewis's natural life expectancy.

A third approach would be to apply only the *Caballero* per se ban to the sentence as a whole, even though one of Lewis's crimes was a homicide, and reject the possibility of an LWOP sentence under *Miller*. In support of this approach, California might choose to employ a rule that is more favorable for defendant than the United States Supreme Court requires; and as a matter of policy, it might be argued, even a juvenile who has committed a homicide should be able to have a parole eligibility hearing at some point in his or her lifetime, since the difficult task of evaluating a juvenile's corruption would be unnecessary at sentencing if it could be accomplished later by a parole board.

Of interest in this regard is the recent decision in *People v. Ramirez* (2013) 219 Cal.App.4th 655 [162 Cal.Rptr.3d 128] (*Ramirez*). There, two juveniles were convicted of first degree murder and second degree murder, with enhancements and special circumstances. The shooter received LWOP plus 65 years, and the nonshooter received 90 years to life. Thus, each juvenile offender had an LWOP or a de facto LWOP based purely on homicide-related offenses. The trial court did not make a *Miller* determination that the juveniles' crimes reflected irreparable corruption. (*Ramirez, supra*, 219 Cal.App.4th at p. 685.)

The appellate court in *Ramirez* reversed the sentences, holding that sentencing the juveniles to an actual or effective LWOP, without taking into consideration their youth and related factors, constituted cruel and unusual punishment under *Miller*. (*Ramirez, supra*, 219 Cal.App.4th at pp. 683–685.)[†] The court further concluded that the juveniles could not be sentenced to an actual or effective LWOP upon remand. (*Id.* at p. 685.)[†] The court observed that in California the ultimate decision to keep a juvenile offender in prison for life can be decided later (at a parole eligibility hearing), so "a sentencing decision which forecloses a juvenile offender's options at the outset would appear inconsistent with both the spirit and rationale of *Graham* and *Miller*." (*Id.* at p. 686.) Furthermore, the Legislature's enactment of section 1170, subdivision (d)(2)—which guarantees a juvenile the opportunity to seek recall of an actual LWOP after serving 15 years for most offenses—suggests the Legislature would not approve of imposing a theoretically lesser sentence on

a juvenile without any possibility of parole. (219 Cal.App.4th at pp. 686–687.)▐ The court also noted that, although there is a distinction between a homicide (in *Ramirez*) and a nonhomicide (in *Caballero*), that distinction did not bear on the offenders' relative culpability, because in both *Caballero* and *Ramirez* the offender *intended* to kill someone. In the majority's view in *Ramirez*, *Caballero* implied that a gang member's intent to kill rival gang members, without more, was insufficient to meet the *Miller* construct of irreparable corruption. (*Ramirez, supra*, 219 Cal.App.4th at p. 688.)▐

The court in *Ramirez* therefore directed the trial court to "exercise its discretion to impose sentences which ensure these juvenile defendants have a meaningful opportunity to demonstrate rehabilitation and potentially obtain their release within a reasonable period of time." (*Ramirez, supra*, 219 Cal.App.4th at p. 688.)▐ In short, the court did not remand for consideration of the *Miller* "irreparable corruption" finding, but to set a parole eligibility date as in *Caballero*.[10]

### c. *Conclusion*

▐ In our view, the constitutionality of a parole eligibility date must be determined by looking at the sentence as a whole, since a defendant obtains a single parole eligibility date based on the entirety of his or her sentence. In this case, Lewis was convicted not just of nonhomicide offenses, but of a homicide offense as well. Our Supreme Court was careful to point out that *Caballero* did not address a situation where the juvenile offender, like Lewis, had committed a homicide. (*Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.) ▐ Since the United States Supreme Court recognizes there are circumstances in which a juvenile who commits a single homicide as his only offense might be found to be of such irreparable corruption as to warrant an actual LWOP without offending the Eighth Amendment, certainly there could be circumstances in which a juvenile who commits a homicide *and* three separate one strike sexual offenses could be of such irreparable corruption as to warrant a de facto LWOP without offending the Eighth Amendment. Because the trial court in this case did not have the opportunity to make this determination under *Miller*, we will remand for the trial court to have that

---

[10] In a concurring and dissenting opinion, Justice Aronson concluded that the parties should be given an opportunity to address the defendants' corrigibility on remand, in light of the absence of evidence on that issue in the record. Justice Aronson noted that *Caballero* expressly did not consider whether an LWOP or its functional equivalent could be imposed on a juvenile who commits murder, *Miller* declined to foreclose the possibility, and the trial court's sentencing choice on remand might moot any constitutional question. (*Ramirez, supra*, 219 Cal.App.4th at pp. 689–691 (conc. & dis. opn. of Aronson, J.).▐

opportunity. (*Miller, supra*, 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. at pp. 2468–2469]; *Ramirez, supra*, 219 Cal.App.4th at pp. 689–690 (conc. & dis. opn. of Aronson, J.).█ See *Caballero, supra*, 55 Cal.4th at p. 268, fn. 4 [under *Miller*, the sentencing court must " 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison' "].)     ██     If the court does not find that Lewis's offenses reflect irreparable corruption within the meaning of *Miller*, the court shall set a parole eligibility date within Lewis's expected lifetime as set forth in *Caballero*. (*Caballero, supra*, 55 Cal.4th at pp. 268–269 ["the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board"].)

## III. *DISPOSITION*

The matter is remanded for the trial court to determine a parole eligibility date within Lewis's expected lifetime, unless it finds that Lewis's offenses reflect his irreparable corruption within the meaning of *Miller v. Alabama, supra*, 567 U.S. ___ [132 S.Ct. 2455]. In all other respects, the judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 26, 2014, S216019.