Filed 3/11/14  P. v. McCutchen CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KAYL GERARD McCUTCHEN,<br><br>        Defendant and Appellant. | A134003<br><br>(Contra Costa County<br>Super. Ct. No. 51007624) |

Defendant Kayl McCutchen, 17 years old at the time, was charged with murder (Pen. Code, § 187),[1] second degree robbery (§§ 211, 212.5, subd. (c)), and attempted second degree robbery (§§ 664, 211, 212.5, subd. (c)).  In connection with the murder, the prosecution alleged a "special circumstance" of robbery under section 190.2, subdivision (a)(17).  In connection with all three charges, the prosecution alleged defendant personally used and intentionally discharged a firearm causing great bodily injury and death under section 12022.53.  Defendant was convicted as charged and sentenced to life in prison without the possibility of parole (LWOP).  We affirm defendant's conviction but remand for resentencing.

## BACKGROUND

On June 28, 2009, shortly before 10:22 p.m., Matthew Butler was shot six times while parked in his Ford Taurus at Williamson Ranch Park.  An eyewitness who heard

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

the shots saw a skinny, male, approximately six feet tall, wearing a white T-shirt and possibly long shorts, run off from the passenger side of the car. He also saw a heavy-set Black male approach the car and then take off running. At trial, the eyewitness testified defendant's appearance matched that of the skinny male.

The killing of Butler was connected with activities taking place at 5116 Thistlewood Court in Antioch, a residence 75 yards from the crime scene. Charles Hughes, then 20 or 21 years old, lived there along with numerous family members, including his girlfriend Trinnea Watson, their seven-month-old twins, Watson's mother Constance Richardson, Watson's aunt, and the aunt's 16-year-old son, his cousin James H. Defendant and James H. were close friends, and they both would hang out with Hughes.

Hughes purchased a handgun in May 2009, just a month before the shooting, from a friend of James H. Defendant and James H. both knew Hughes had the gun.

On the night of June 28, Butler was with his friend, Tyler Phelan. Butler told Phelan he was going to sell marijuana to "some black guys" at the 7-Eleven, but was nervous about the sale, not having done business with them before. Butler left to make the rendezvous. Phelan, concerned, made his way to the 7-Eleven about 10 to 15 minutes afterwards. When he arrived at the 7-Eleven, Phelan saw police and ambulances at the Williamson Ranch Park.

According to Hughes's testimony, defendant expressed a desire to steal marijuana from a drug dealer. Defendant and Hughes met at the park. Defendant then asked for Hughes' gun and cell phone, and asked Hughes to wait in the park as reinforcement while he went to meet the drug dealer, Butler, at a 7-Eleven across the street from the park. Later, Hughes saw Butler's car arrive at the park. He heard gunfire, and saw defendant emerge from the car. Then they both retreated to the Thistlewood Court residence.

Back at the house, defendant told Hughes how Butler had struggled to grab the gun away. Defendant also showed Hughes the marijuana he took. Defendant asked

2

Hughes to dispose of the gun. He also asked Hughes if he would retrieve defendant's own cell phone, which he had left at the crime scene. As the park and Thistlewood Court were already teaming with police, Hughes refused to look for the phone. He agreed, however, to help dispose of the gun. He had his cousin James H. take the gun in his knapsack so as to dispose of it en route to summer school, a tactic he thought would confound law enforcement.

Police, though, had already linked the Thistlewood Court residence with the crime using data associated with Butler's cell phone. James H. got caught with the gun as he left the residence, and police arrested James H., Hughes, Watson—"everybody in the household almost." Hoping to keep innocent but now-arrested members of his household out of further trouble, Hughes implicated himself and defendant to police. Hughes pleaded guilty the murder and testified at trial against defendant in exchange for the possibility of parole and use immunity.

Hughes's girlfriend Watson also testified against defendant. She witnessed defendant's frantic arrival at the Thistlewood Court home late on June 28. Defendant, at that time, confessed the killing to her. She saw him throw a purple key chain, labeled with the word "Taurus," in a second-story bathroom trash bin, and told him he had to get rid of it. She informed the police of this at the time. Watson asked her mother, Constance Richardson, to drive defendant home. Richardson, unaware of the killing, agreed. At trial, Watson claimed she had seen defendant with the gun in the second-story bathroom. She denied previously telling this to police, instead stating she had not seen defendant with the gun as he came *up the stairs* to the bathroom. She claimed she feared implicating her boyfriend, who owned the gun, and so had parsed the police officer's questions with a fine tooth comb.

James H., who was found with the gun, testified, also under use immunity, that he spent the night of the shooting at his girlfriend's house. His girlfriend corroborated this. James H. had at first told the police the gun came from a man with dreadlocks he

3

encountered while biking home from his girlfriend's place.  He recanted and told police about Hughes after a pause in his interview during which his mother, Hughes's aunt, told him to tell the truth.

James H. admitted he sent text messages to a friend on June 26, 2009, saying: "I'm bust anyone that think I'm a little nigga" and "I'm a wake someone game up today. You going to hear about me on the news tonight."  He also admitted he sent a text to defendant on June 27, 2009, suggesting he had a gun and saying:  "I need some money. Who I got to rob and kill?"  In both cases, James H. told the jury he was just playing.  On June 28, at 9:32 p.m., after a series of texts with defendant about robbery, James H. received a text from defendant saying " 'I got one for us.' "  James H., like defendant, is skinny, Black, and approximately six feet tall.

Defendant testified and denied the murder.  He admitted purchasing marijuana from Butler at the 7-Eleven on June 28, but at around 7:45 or 8:00 p.m.  He claimed he and Hughes met, and the two of them smoked and walked around the park until about 10 p.m., when he went to the Thistlewood Court residence.  Defendant had asked James H. to join them, but he never saw James H. that night.  Defendant admitted to writing down gangster rap lyrics about drugs and putting slugs in someone's chest if they do not do what you tell them.

Law enforcement personnel offered additional evidence.  A surveillance camera monitoring the 7-Eleven captured video, at approximately 10:16 p.m., of Butler's car and a Black male, wearing a white T-shirt and what appeared as either jeans or shorts,[2] getting into it.

Bullets from Butler's body matched bullets test fired from Hughes's gun seized from James H.  One "characteristic" gun residue particle was found on one of James H.'s

---

[2]  Although an officer testified the man in the video was wearing "pant[s]—blue jeans," it was repeatedly argued to the jury, after they watched the video for themselves, the man was wearing shorts.

4

hands, but such a result with "very few particles" is not conclusive for firing of a gun and could merely show James H. had handled something or touched someone that had come in contact with a fired gun. No particles were found on Hughes or defendant, but if particles had been present they could have been removed with washing.

Defendant's cell phone was found at the park during the police investigation. According to one police officer, the following sequence of cell phone calls took place on the night of the murder: 9:33p.m., James H.'s cell to defendant's; 9:34 p.m., defendant's cell to Hughes's; 9:37p.m., defendant's cell to Butler's; 9:37 p.m., defendant's cell to Hughes'; 9:37 p.m., defendant's cell to Butler's; 9:38 p.m., defendant's cell to Butler's. Hughes's cell phone records showed calls from his phone to Butler, the last of which was at 10:15 p.m. There was no evidence of a call between James H. and Hughes that night.

A jury convicted defendant of all charges and found all sentence-enhancing allegations true. For the murder, the trial court sentenced defendant to LWOP and added a consecutive enhancement of 25 years to life pursuant to section 12022.53, subdivision (e)(1). For the robbery charges, the trial court stayed sentence under section 654.

**DISCUSSION**

*Admission of Rap Lyrics*

During a search of defendant's bedroom, officers found two sets of handwritten rap lyrics. The authorship of the lyrics remains ambiguous. Defendant testified: "truthfully I'm not a music writer . . . I listen to a lot . . . so every once in a while I do just write some lyrics down." He then appeared to adopt the prosecutor's premise that he wrote down the contested lyrics, stating he was "just rhyming" when asked why he wrote them.

Over defendant's objections, the trial court allowed some of the lyrics to be admitted into evidence. Lyric "2" was excluded as inadmissible propensity evidence, as it largely would have been relevant to showing, in the lyric's words, that defendant since "ninth grade" had been "a full-blown menace." The trial court did allow, however, lyric

5

"1," but told the jury it was allowed only for purposes of proving "premeditation or admission of offense:"

A portion of lyric 1 states:

Ridin' with a TEC-9 and a chopper in the back,
So you don't be surprised if we run up in yo trap.
Dipped in all black, yelling, where da drugs at?
And homie when we does dis, boy you better does that
Kuz it's gonna be your chest where I put the slugs at.

Another states:

I sling crack pimps hoes, bust gat.
Glamorized by it all since I was a rug rat.
Dats why I stomp a nigga down as if he were a rug rat.
Take 'em for a brick and break it down.

The officer who found the lyric, Detective Mortimer, testified the first portion describes using weapons to threaten people for drugs in their "trap" or home. The other portion describes selling (slinging) and stealing (taking) drugs, shooting guns (gats), and belittling (stomping down). On cross-examination, Mortimer testified the police did not find at defendant's home the kinds of weapons and drugs described in the lyrics. He agreed rap was about boasting and puffing, that the lyrics were typical of the genre, and that there are rap artists "in this vein" who are doing "just fine."

Over the course of the trial, lyric 1 came up a handful of times. The prosecutor briefly mentioned the lyrics in her opening statement, saying some rap lyrics found in defendant's closet had "words eerily mimicking the murder of Matthew Butler." She then quoted the last four lines of the first portion quoted above. There was also Mortimer's testimony concerning the lyrics, which, including direct and cross-examination, spanned about 13 pages of the 10-volume, 1874-page reporter's transcript. The prosecutor also questioned defendant, amounting to two pages of the transcript, about the first portion of the lyric and about the line "stomp a nigga down." During

6

closing argument, the prosecutor, in her initial presentation, mentioned the line "stomp[] a nigga down," claiming it was consistent with admitted evidence of a prior crime, and asked the jury to recall the lyrics "about murdering drug dealers, filling their chests full of lead." Defense counsel, in two paragraphs of argument, countered the lyrics were vague fantasy, and then compared them to the boasting and playing in the text messages of both defendant and James H. Counsel did not discuss whether defendant transcribed or created the lyrics.

Defendant contends the trial court should not have admitted any of the lyrics. They were unsigned and undated, and not attributed to defendant. Moreover, he claims they were unduly prejudicial propensity evidence, and the prosecution's argument regarding the lyrics was ultimately a propensity argument, not an argument about defendant's premeditation, plan, motive, or intent. Defendant claims not only a violation of state evidence law, but also of his right to due process and a fair trial.

Statements by a defendant of all sorts, rap lyrics included, can show requisite criminal intent. (See, e.g., *People v. Lang* (1989) 49 Cal.3d 991, 1013 [murder defendant's habit of carrying a gun and statements he would "waste" who interfered with him were relevant to his state of mind]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 756–757 [murder defendant's threat against victim is relevant to prove intent and a generic threat is admissible to show defendant's homicidal intent where other evidence brings actual victim within scope of threat].) Even statements of others in a defendant's possession may be admissible when, for instance, "the relevancy . . . may not be disputed." (*People v. Jones* (1971) 19 Cal.App.3d 437, 449 [note in defendant's possession concerning the charged crime].)

It is concerning, however, that the lyrics here were admitted against defendant without any real attempt by the prosecutor to prove defendant's authorship of, adoption of, or particular connection to the lyrics (aside from defendant having them in his bedroom). This is not a case like *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372, in

7

which the admitted handwritten rap lyrics referred to their composer using the defendant's gang moniker and easily-derived nickname while, also, including references to defendant's gang. Nor is it like *People v. Zepeda* (2008) 167 Cal.App.4th 25, 32–33, in which the defendant's picture was on the inside cover a CD of rap songs and defendant was credited on the CD as author of the two songs the prosecution played at trial. We start down a wavering path when we begin to judge people's actions by the content of the literature they keep. (See *In re George T.* (2004) 33 Cal.4th 620, 636–639 [lyrics of poem, when ambiguous, and given lack of incriminating circumstances, did not amount to a criminal threat].)

Nonetheless, the evidence here suggests defendant at least transcribed the lyrics, and a jury might conclude defendant's selection of these particular lyrics, as opposed to all others, was purposeful, and indicated defendant's intent, plan, or motivation. And, the lyrics do, indeed, show far more than a generalized threat of violence. They suggest contemplation by defendant of stealing drugs at gunpoint, and killing in the face of resistance. (See *People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1373 & fn. 4 [lyrics with general threats of violence admitted as they "dealt with Mora's opinions concerning rival gangs and gang members"].)

Even if we were to agree with defendant that the lyrics should have been excluded, any error was harmless, under either the state law *Watson*[3] standard (would the same result absent the error be "reasonably probable") or the constitutional *Chapman*[4] standard ("reversal is required unless the State can prove beyond a reasonable doubt that the error did not contribute to the verdict"). The rap lyrics were cumulative evidence of defendant's robbery plan, in addition to the text messages he sent, the call logs between

---

[3] *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).
[4] *People v. Chapman* (1967) 386 U.S. 18, 24 (*Chapman*).

him and Hughes, Hughes' testimony that defendant wanted assistance in robbing a drug dealer with Hughes' gun, and the eyewitness testimony concerning the use of the gun.

Moreover, the rap lyrics occupied a small role in the arguments of counsel. The key inculpating evidence—and the evidence the prosecutor argued—was defendant's detailed planning with Hughes and confession to Watson; cell phone records showing defendant's and James H.'s whereabouts, the calls between Hughes and defendant, and the lack of calls between Hughes and James H.; James H.'s alibi; and the surveillance video showing a man dressed like defendant at the 7-Eleven just before the killing, not earlier in the evening as he claimed.

Not only did the rap lyrics play a limited role at argument, when introduced by detective Mortimer, defense counsel successfully established on cross-examination that the lyrics were typical of the rap genre, that the genre involves boasting, that rappers do not necessarily act out rap lyrics, and that police found none of the particular weapons or drugs referenced in the admitted lyrics.

Finally, the court instructed the jury on the proper use of limited-purpose evidence and how to handle circumstantial evidence of criminal intent, telling the jurors if circumstantial evidence allows "two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to its absence, you must adopt that interpretation which points to its absence." The jury is presumed to have followed these instructions. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

"To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which

9

rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230.)

Only on "rare and unusual occasions" will "admission of evidence . . . violate[] federal due process and render[] the defendant's trial fundamentally unfair." (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 232 ["Given the nature and amount of this gang evidence at issue, the number of witnesses who testified to Albarran's gang affiliations and the role the gang evidence played in the prosecutor's argument, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict."]; *People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20 [" 'Ordinarily, even erroneous admission of evidence does not offend due process unless it is so prejudicial as to render the proceeding fundamentally unfair[;]' . . . even the improper admission of evidence of uncharged crimes committed by the defendant."].)

For the reasons just discussed, this is not that case. The jury could infer from defendant's interest in writing down the particular rap lyrics a motivation on defendant's part to engage in violent robbery for drugs, and the rap lyrics, which played a relatively small role in the trial, merely corroborated other evidence of motive and intent. (See *People v. Covarrubias*, *supra*, 202 Cal.App.4th at pp. 20–21 ["while Covarrubias contends that Agent Flood's testimony"—which accounted for a large portion of the prosecution's case—" 'introduced the unproven assumption that appellant was part of a drug trafficking organization,' the jury could have reasonably drawn such an inference from the other evidence in the case"].)

## *Prosecutorial Misconduct*

In defendant's closing argument, counsel told the jury "[t]he words 'not guilty' [do not] mean that the system is broken." In the People's closing argument, the prosecutor responded: "[T]his concept of a not guilty verdict doesn't mean that the system isn't broken. Yeah, it absolutely would mean that the system is broken. It

absolutely would mean that a defense attorney engaging in histrionics and drama in a courtroom and misrepresenting testimony [¶] . . . [¶] has subverted the system. Defense counsel called out "[o]bjection." The trial court then instructed the jury its recollection would control, "this is argument," and "it is for you to decide what the evidence is." Defendant asserts the prosecutor's argument was misconduct and the trial court's admonition was inadequate to safeguard a fair trial.

Defendant also asserts it was misconduct when the prosecutor asked defendant on cross-examination "how many hours would you say that you and your lawyer have spent together discussing your testimony here today." Defense counsel again called out "object[ion]," which the trial court sustained, and defendant made no answer.

To begin with, although "objecting," defendant never mentioned as a ground prosecutorial misconduct in the trial court and never requested any curative instructions aside from what the trial court gave on its own. " 'In general, " ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety." ' " [Citation.]' [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 863.)

In any case, neither statement amounted to misconduct. Asking a witness how long they spent with counsel preparing to testify is not misconduct. Nor was the prosecutor's retort to defense counsel's "not guilty/not broken" argument. (See *People v. Marquez* (1992) 1 Cal.4th 553, 575 [not misconduct to refer to " 'heavy, heavy smokescreen that has been laid down [by the defense] to hide the truth from you' "]; *People v. Huggins* (2006) 38 Cal.4th 175, 207 [" '[defense counsel] has a tough job, and he tried to smoke one past us' " not misconduct; "comments were explicitly aimed at counsel's closing argument and statement, rather than at him personally"].)

11

### Juror Misconduct and New Trial Motion

Defendant also complains of alleged misconduct by prospective Juror No. 6, who sat on the jury as Juror No. 4. According to defendant, Juror 6 failed to disclose the extent of his relationship with Steve Dyer, a police officer *not* involved in the murder investigation; failed to disclose a relationship with Detective Mortimer, who *did* investigate the murder and testified about rap lyrics; and introduced improper outside information into the jury's deliberations.

In answer to background questions during voir dire, Juror No. 6 volunteered his brother had served time "for a similar deal" and he "kn[e]w a police officer in Concord, Steve Dyer." "He's a —we went to high school together." Defense counsel did not probe Juror No. 6 on details relating to his relationship with Dyer or his brother's offense. Defendant made no mention of a relationship with Officer Mortimer. Mortimer's name, along with the names of other likely witnesses, were given to prospective jurors so they could alert the court if any names were of people they knew.

After the jury had been excused and thanked, Juror No. 6 approached defense counsel just outside the courthouse. In Juror No. 6's mind, he thought defense counsel looked like a former teacher of his, Tom Torlakson, and he was curious if there was any relation. According to an April 8, 2011, declaration of defense counsel, Juror No. 6 said he was surprised he had not drawn more questions from the attorneys during voir dire given Dyer was the best man at his wedding, as well as the very police officer that had arrested his brother. Juror No. 6 and defense counsel discussed various aspects of the case, and Juror No. 6 took defense counsel's business card, with his brother in mind.

Based on this revelation, the trial court, on May 27, 2011, sent a letter sent to jurors notifying them defense counsel wished to unseal their contact information and offering them a chance to consent or object. On July 15, 2011, the trial court denied unsealing. But defense counsel presented a new declaration, claiming Juror No. 6 and Detective Mortimer were both associated with a football team, the East Bay Outlaws, at

12

the time Mortimer testified at trial in November 2010. Counsel identified Mortimer as linebacker, one of 60 players on the team's roster, and Juror No. 6 as a coach. Based on this declaration, defense counsel asked the trial court to subpoena Juror No. 6, and no other jurors, for an evidentiary hearing, and the trial court obliged.

At the August 26, 2011, evidentiary hearing, Juror No. 6 confirmed Dyer was one of his best friends, the best man in the first of his two weddings, and the officer who arrested his brother. Juror No. 6 stated he had disclosed Dyer as a close friend and his best man at voir dire, but could not point to any portion of the written record shown to him where that occurred. He then became convinced the court reporter had failed to capture words to that effect where the dash appears in the reported voir dire testimony "He's a—we went to high school together."

Juror No. 6 also testified he now knows Mortimer. "He was . . . a player apparently on the [football] team I was coaching," but Juror No. 6 "didn't know him" before trial. He had been just a nameless player on the field. Juror No. 6 was a coach for the 2009 and 2011 seasons, but not 2010—the year of the trial—because for that season, he had wanted the job of head coach, did not get the job, and did not want to work under the person selected. He attended no games that season. As a coach prior to trial, Juror No. 6 worked with the defensive backs and special teams; there was a separate linebacker coach. Mortimer was not one of his defensive backs and was not on his specials teams. When Mortimer's name was read to jurors before trial, Juror No. 6 did not recognize it or associate it with anybody. Nor did Juror No. 6 recognize Mortimer when he took the stand. After the trial, when Juror No. 6 returned to coaching, he recognized Mortimer on the football field and they later became "Facebook friends."[5]

---

[5] A private investigator later interviewed Juror No. 6's football teammates in late October and November 2011. They said it was likely that Mortimer and Juror No. 6 knew each other, but none said anything about whether they would have known each other at the time of the trial.

13

Finally, Juror No. 6 denied discussing traffic at a particular intersection near Williamson Ranch Park, denied telling jurors Hughes could not purchase a gun lawfully in California if under 21, and denied telling the jury the lights at the 7-Eleven were sodium halide and the effects such lights might have (though he knew sodium halide lights could change the appearance of certain colors).

Defense counsel opined Juror No. 6 was lying about his voir dire answers, lying about his interactions with Mortimer, and lying about what he told and did not tell jurors during deliberations.[6] Defendant then requested permission to summon other jurors to check up on Juror No. 6's version of events. The court denied this request, but invited briefing on the misconduct issues.

Defendant then filed a motion for new trial based on the alleged misconduct of Juror No. 6. The day before the hearing on the motion, defendant sought a continuance because he had subpoenaed Mortimer to appear at the hearing, but Mortimer was unavailable. At the hearing, defense counsel admitted to speaking with Mortimer about the subpoena, but stated he asked Mortimer nothing about Juror No. 6, because he, for unexplained reasons, thought the court would frown on such questioning. The trial court denied the continuance. It then denied the motion for new trial, finding Juror No. 6 credible and incapable of the kind of artifice defense counsel suggested, and that his omissions during voir dire were unintentional. It also found that even had Juror No. 6 interjected out-of-court information into the jury room, it was immaterial.

Defendant challenges the trial court's misconduct rulings and asserts the court should have taken additional evidence before ruling.

There was no error in the trial court's misconduct rulings related to Juror No. 6 not disclosing information about Dyer and Mortimer. "A criminal defendant has a

---

[6] Defense counsel made lengthy arguments about Juror No. 6. We note "[u]nsworn statements cannot be used to establish juror misconduct." (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1043.)

constitutional right to an impartial jury, and the pretrial voir dire process is important because it enables the trial court and the parties to determine whether a prospective juror is unbiased and both can and will follow the law. But the voir dire process works only if jurors answer questions truthfully." (*People v. Wilson*, *supra*, 44 Cal.4th at p. 822.)

"Not every failure to disclose background information in response to voir dire questioning constitutes misconduct by jurors. ' "Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under . . . sections 1089 and [former] 1123 that he is unable to perform his duty.' " ' [Citations.]" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 371 (*Tuggles*).) "In evaluating claims of intentional concealment by jurors during voir dire, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*Ibid.*)

As to Dyer, Juror No. 6 revealed the existence of his relationship with the officer, but defense counsel explored the matter no further. The trial court, itself, questioned Juror No. 6, found him credible, and concluded Juror No. 6 truly believed he had disclosed his close relationship to Dyer at voir dire and any failure to disclose was inadvertent. Given the trial court's credibility determination, which we accept on appeal (*Tuggles*, *supra*, 179 Cal.App.4th at p. 371), these findings are supported by substantial evidence. In the end, "[c]onsidering all the circumstances," including Dyer's lack of involvement in the case, "any unintentional concealment here does not establish to a demonstrable reality that [Juror No. 6] was unable to perform his duty as a juror." (*People v. Wilson*, *supra*, 44 Cal.4th at p. 824, italics omitted.)

15

As to Mortimer, the trial court believed Juror No. 6's testimony that he and Mortimer did not know each other before trial. Substantial evidence supports also this conclusion.

As to Juror No. 6's alleged interjection of extra-record evidence, we conclude the trial court also did not err in its handling of this issue. To begin with, we accept the trial court's finding, based on Juror No. 6's testimony, that he interjected no such evidence. Moreover, any presumption of prejudice was rebutted. (See *People v. Harris* (2013) 57 Cal.4th 804, 856 [the " ' "presumption of prejudice . . . may be rebutted by a showing that no prejudice actually occurred" ' "]; *People v. Williams* (2013) 218 Cal.App.4th 1038, 1074 [if alleged misconduct is receipt of extra-record evidence, " ' "the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias." ' "].) The alleged extra-record evidence—concerning traffic near Williamson Ranch Park, the age requirement for handgun purchases, and the effects of sodium halide lighting—was so far afield from the guilt or innocence of defendant that it is no surprise the trial court determined there was no prejudice. These three topics did not meaningfully bear on the central question of whether the jury believed defendant or James H. was the killer. (*In re Boyette* (2013) 56 Cal.4th 866, 897 [no misconduct when evidence not "important factor" to reaching result].) Nor was there any showing the alleged evidence demonstrated or furthered any bias on the part of Juror No. 6. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 ["the verdict will be set aside only if there appears a substantial likelihood of juror bias"].)[7]

The court did not err in refusing to take additional evidence. The court would have had discretion to do so. (*Tuggles, supra*, 179 Cal.App.4th at p. 387 ["the trial court

---

[7] Further, there actually *was* trial testimony from Hughes about California's gun laws. He stated "I don't know the gun laws in California, but I was 20 at the time. I didn't think I could buy a gun anyway."

16

. . . erred by concluding that it had no power to order jurors to attend an evidentiary hearing after they declined to discuss the case with counsel"], italics omitted.) But the interest in obtaining further evidence is balanced against juror's statutorily recognized interest in privacy. "Trial courts have broad discretion to manage these competing interests by allowing, limiting, or denying access to jurors' contact information." (*Id.* at pp. 380, 386–387; see also *People v. Polk* (2010) 190 Cal.App.4th 1183, 1202 [on a new trial motion based on juror misconduct, "the trial court has the discretion to hold an evidentiary hearing to determine the validity of the charges if there are material, disputed issues of fact" but "[s]uch a hearing is not to be used . . . as a ' " 'fishing expedition' " ' "].) The trial court was well within its discretion to deny access to other jurors. As already noted, the information Juror No. 6 allegedly interjected into deliberations was not material and any such misconduct would have been harmless. Accordingly, there was no reason to explore further whether Juror No. 6 actually made the alleged interjections.

Nor did the trial court abuse its discretion in denying a continuance so Mortimer could testify. (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 ["The determination of whether a continuance should be granted rests within the sound discretion of the trial court . . . ."].) Not only did the trial court credit Juror No. 6's timeline of his interactions with Mortimer (in which the two did not know each other before trial), defendant's eleventh-hour request for a continuance, made without any suggestion of what Mortimer would say if he were to appear, showed a lack of diligence the trial court did not need to condone. Defense counsel had months to question Mortimer on his own to obtain favorable evidence for the hearing, but did not do so.

### *Sentencing*

Although we affirm defendant's conviction, the trial court must reconsider its decision to commit defendant, then 17 years old, to prison for life without possibility of parole in light of *Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455] (*Miller*), decided after sentencing in this case.

*Miller* held mandatory life imprisonment without possibility of parole for juveniles, including those convicted of murder, violates of the federal Constitution's prohibition on cruel and unusual punishment. (*Miller*, *supra*, 132 S.Ct. at pp. 2460, 2469.) "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at p. 2468.) "[G]iven all we have said . . . about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 2469.)

Under the Penal Code, the penalty for a person convicted of first degree murder with one or more special circumstances found true, who was 16 years of age or older and under the age of 18 years at the time of the commission of the murder, "shall be

18

confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).) Courts have interpreted section 190.5 to mean life without parole is the statutorily identified *presumptive* punishment for a 16- or 17-year-old special circumstance murderer, unless a sentencing court, in the exercise of its discretion, finds good reason to impose a less severe sentence of 25 years to life. (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089 [" 'The enactment by the People evidences a preference for the LWOP penalty.' "].)

The trial court here made no mention at sentencing of factors related to defendant's youth and, indeed, found no factors weighing in mitigation. The probation report, on which the trial court relied, actually stated the special circumstances allegations of section 190.2, subdivision (a)(17), carried a "death sentence" or imprisonment "for life without the possibility of parole." It also reported the prosecutor had stated the trial court had no discretion in sentencing due to the special circumstances finding and that "defendant is expected to receive a sentence of life without parole." Given all this, we cannot say the trial court properly exercised its sentencing discretion in a way that would comport with *Miller*. (See *People v. Lewis* (2013) 222 Cal.App.4th 108, 122–123 ["Because the trial court in this case did not have the opportunity to make this determination under *Miller,* we will remand for the trial court to have that opportunity."].)[8]

We reject the Attorney General's claim that defendant forfeited the LWOP issue by not objecting during sentencing. (See, e.g., *People v. Burgener* (2003) 29 Cal.4th 833, 886 [cruel and unusual punishment claim forfeited by failure to object in trial court].) We will not apply the forfeiture doctrine here, given *Miller* issued after defendant's sentencing.

---

[8] Same result in: *People v. Owens* (Sept. 24, 2013, C069838, C069853) [nonpub. opn.].

19

## DISPOSITION

The judgment is affirmed, but the matter is remanded to the trial court for resentencing in light of *Miller*.

               _____

               Banke, J.


We concur:


_____

Margulies, Acting P. J.


_____

Becton, J.[*]

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.