Filed 10/1/14  P. v. Harris CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS HARRIS,<br><br>     Defendant and Appellant. | A136727<br><br>(Alameda County<br>Super. Ct. No. 167882) |

## I.

## INTRODUCTION

Appellant, who was associated with a gang, was convicted of the fatal shooting of two young men affiliated with a rival gang.  Appellant was not charged with any gang-related crime or enhancement, but the trial court admitted stipulated facts about gangs, and evidence about appellant's gang connections, to show appellant's motive for the murders.  Appellant was 17 years old at the time of the murders, but was tried as an adult, and sentenced to an indefinite prison term of 100 years to life.

Appellant contends the trial court erred in admitting an excessive amount of gang evidence, as well as excessive and improper evidence of appellant's telephone calls from jail.  Appellant further contends he received ineffective assistance of counsel, in that his trial counsel should not have stipulated to background facts about the gangs with which appellant and the victims were associated; should have objected on authenticity grounds to the admission of electronic evidence derived from social media websites; and should have objected and requested a curative instruction when the prosecutor made an

1

assertedly improper comment on appellant's exercise of his right not to testify. Appellant also argues that the cumulative effect of the trial judge's evidentiary rulings and his trial counsel's ineffectiveness deprived him of a fair trial.

We reject all of these arguments, and affirm appellant's convictions. However, we find merit in appellant's challenge to his sentence. Because appellant was a juvenile at the time of the murders, the trial court was constitutionally required to consider certain potentially mitigating aspects of appellant's individual circumstances before sentencing him to the functional equivalent of life in prison without parole, and to exercise its sentencing discretion in light of those factors. The record strongly suggests that the trial court failed to undertake this constitutionally required analysis. We therefore reverse as to appellant's sentence, and remand for resentencing.

## II.
## FACTS AND PROCEDURAL BACKGROUND
### A. The Shooting

On November 6, 2010, a group of people started filming a music video at Acorn Towers, a low-income housing project in Oakland. Prior video productions at the same location had led to gang-related violence, so when the filming drew a crowd, the security officers at the project became concerned, and called a halt to the filming.

Later the same day, during the afternoon, two young men named Nario Jackson and Edward Hampton arrived at the Acorn Towers complex in a purple Jaguar, and parked in front of one of the buildings. Jackson and Hampton were associated with two gangs, Ghost Town and Lower Bottoms, that were allied with one another. Ghost Town and Lower Bottoms were rivals of the Gas Team gang, which claimed Acorn Towers as part of its territory.

As Jackson and Hampton sat in their parked car, three or four young Black men approached and began speaking with them. One of the men was Dionte Houff, known as "Birdman," who was a member of the Gas Team gang. About 20 or 30 minutes after Houff and his companions approached the car, another young man, who was wearing jeans and a black sweatshirt with the hood pulled up, approached the Jaguar from the

rear. The man pulled out a semiautomatic pistol, fired several shots into the car in rapid succession, and then ran away, heading through a side gate toward the rear of the Acorn Towers buildings.

A woman named Keishawn McQuirter, who was outside in front of Acorn Towers playing with her toddler son, saw the shooting. Although she did not know appellant well, she recognized him as the shooter, both from what she could see of his face and from his distinctive "bowlegged" walk.[1] Soulinha Chinhdamat, an Acorn Towers security guard, also witnessed the shooting, but did not see the shooter's face and was unable to identify him.

Chinhdamat described the shooter as a dark-complexioned man about five feet eight inches tall, weighing about 160 pounds.[2] Chinhdamat also observed that the other young men near the victims' car did not seem surprised by the shooting, and accompanied the shooter as he ran away.

Chinhdamat ran to the Jaguar, but the victims were unresponsive. He then ran in the direction in which the shooter had fled. He lost sight of the shooter, however, and when he reached the rear of the building, there were about 30 people there.

## B. The Police Investigation

Police officers arrived at the scene soon after the shooting, and found the victims unresponsive. Both victims soon died at the scene. Most of the bystanders at the scene were reluctant to speak to the police, for fear of retaliation. The police found several spent nine-millimeter shell casings inside and near the car, all of which were later

---

[1] According to the probation report, appellant had surgery on one of his legs when he was about 12 years old, which left him feeling occasional pain and produced difficulty in walking. Oakland Police Sergeant Sean Fleming tried to interview McQuirter shortly after the shooting, but at the time, she did not reveal what she had seen because she had a robbery charge pending against her and was uncomfortable with the police. Two years elapsed before McQuirter finally told the police she had witnessed the murder.

[2] Respondent's brief states that this description matched appellant's height and approximate weight at the time of the shootings, but gives no supporting record citation for this assertion. We therefore have no basis upon which to assess what weight the jury could properly have given to this evidence.

determined to have been fired from the same gun.  The police also dusted the car for fingerprints, and found the prints of appellant's left palm and left index finger on the rear hood of the car.  The fingerprints of Gas Team gang members Houff and Anthony Meyers were found on the side of the car, along with others that could not be indentified.

A few months after the shooting, a person known as "Toot Tee," who was a family member of one of the victims (Hampton), sent Sergeant Fleming an email about the killing.  The email was represented to consist of transcriptions of electronic messages exchanged between appellant (using the nickname "airitout223s," a variant of appellant's nickname "Air It Out") and his former girlfriend, Roseanna Manning.  Although Manning had been a member of Gas Team in the past, she was close to Hampton's mother.  Perhaps for this reason, Manning had copied her exchange of messages with appellant into an email and sent it to Hampton's stepfather, who had forwarded it to Toot Tee.

In a telephone call leading up to his exchange of messages with Manning, as well as in the messages themselves, appellant told Manning he was in Seattle.  Appellant admitted to Manning that he had shot Jackson and Hampton, and explained he had done so at the direction of members of the Gas Team gang, in order to "prove the point [I] was down with my niggas," i.e., to prove his loyalty to the gang.[3]  He denied that he intended to kill the victims, however: "I told them get out my hood they keep talking shit ii start shootin i swear on burger ronnie and on my brother dame it wasn't to kill them it was to make them cut," i.e., to make them leave.  When Manning asked appellant why he was telling her about his responsibility and motives for the shooting, he responded, "cuz I'm not comin back & what could they do to me now."  In a later telephone conversation with

---

[3] Throughout this opinion, when quoting directly from text messages or material posted on social media, we have retained the capitalization, punctuation, spelling, and wording of the original.  In some instances, this results in our quoting words that would otherwise be inappropriate for use in an appellate opinion.

Manning, appellant expressed regret for his crime, and reiterated that he had not intended to kill the victims.[4]

After receiving the email from Toot Tee, the police investigated appellant, and determined that he had been on juvenile probation at the time of the shooting. As a condition of appellant's probation, he wore a tracking device on his ankle. The location records derived from the tracking device showed that appellant was in front of Acorn Towers at the time of the shooting. The records also indicated that appellant removed the device from his ankle two days after the shooting.

Several months after the shooting, Oakland police picked up another young man, Javiya Evans, for an interview. Evans was associated with the Baby Gas gang, an affiliate or subgroup of Gas Team. A recording of the interview was played for the jury at appellant's trial. When questioned, Evans proved to be aware of rumors circulating on the streets that it was Evans and appellant who had killed Hampton and Jackson.[5] Evans told the police that he had seen appellant commit the shooting from the window of his cousin's fourth floor apartment at Acorn Towers. Evans's description of the event was consistent with other evidence; he said appellant was wearing jeans and a black hoodie, and used a silver nine-millimeter handgun.

Evans told the police it was his understanding that appellant was only supposed to "strip" Jackson and take a medallion Jackson was wearing, and was not supposed to kill him. Evans also told the police it was commonly known that it was appellant who attacked Jackson, and that he did so because Jackson was a member of the Ghost Town

---

[4] Manning testified against appellant at his preliminary hearing, as well as at trial. During the preliminary hearing, people in the courtroom audience made hand gestures at her that mimicked firing a gun. Manning was placed in protective custody for a month after the hearing. After she was released, she was threatened with guns, shot at, and slapped, apparently in retaliation for her preliminary hearing testimony and to discourage her from testifying at trial.

[5] Appellant's defense at trial focused on the theory that it was Evans rather than appellant who shot Jackson and Hampton.

gang and was hanging around Acorn Towers, which was Gas Team's territory. Evans also reported that appellant sold the murder weapon, and then departed for Seattle.

During the interview, Evans expressed fear that he would be killed in retaliation for having spoken with the police. While Evans testified at appellant's trial, the judge interrupted his testimony three times due to disruptive behavior by appellant and persons in the gallery, which appeared to be intended to influence Evans's testimony through intimidation.

In his trial testimony, as well as at appellant's preliminary hearing, Evans recanted his statement about seeing appellant commit the shooting. Evans acknowledged at trial that appellant was a member of Gas Team, but claimed that "Gas" stood for "Great African Scholars" and that the organization's purpose was to encourage the members to attend school. Evans claimed to have been in San Francisco at the time of the shooting, and said he did not remember saying the things the police reported him saying during his interview. He explained his accusation of appellant by saying he wanted to deflect suspicion from himself; was drunk and high during the interview; and lied to police because he was jealous of appellant's success with girls and angry at appellant for slapping and embarrassing him.

Sergeant Fleming interviewed appellant. A recording of the interview was introduced into evidence at appellant's trial. In the interview, appellant denied being involved with the shooting. He admitted he was in the area of Acorn Towers at the time, but explained he was there to attend a baby shower later in the day. Appellant told Fleming he was in a bathroom behind the high-rise building, smoking marijuana, when he heard gunshots and screams and saw people running, so he started running as well.

### C. Electronic Evidence from Social Media

As already noted, appellant left the Bay Area for Seattle within a few days after the killings. While in Seattle, appellant posted a video on YouTube showing him and some friends at a social gathering. The video shows appellant "flashing" a distinctive medallion that belonged to Jackson, according to Manning, and which was reported to the police as missing after his death.

6

During the same time period as the YouTube upload, appellant added numerous posts to a Facebook page he maintained using his "Air It Out" nickname. On December 2, 2010, less than a month after the murders, appellant posted the following message: "Yeah I KNOCKED em down and his NIGGAS know I did it. INSTEAD of gettin wit it niggas SNITCHING like BITCHESSSSSSSSSS." Appellant also told his Facebook audience: "dnt fonk wit snitches lil bra. nigas get knocked down everyday bitch . . . yal gne forget them niggas next month. damn yal runnin yal mouth like investigators shit man dat aint good for yo health believe dat."

### D. Gang Stipulation and Other Gang Evidence

Although the prosecution alleged no gang crime charges or gang enhancements against appellant, it did seek to prove that appellant's motive for the murders was gang-related. In addition, the prosecution sought to show that Evans's retraction of his statement that appellant committed the murders, as well as Manning's fear of testifying, were due to intimidation of these witnesses by appellant's fellow gang members. For these purposes, the trial judge permitted the prosecution to introduce evidence about the gang affiliations of appellant and the victims, as well as a stipulation (the gang stipulation), which was admitted in lieu of testimony by a prosecution gang expert.

The gang stipulation read in its entirety as follows: "ACORN street gang is involved in various criminal activities. It is composed of African-American males and females of all ages with over 100 members and associates. ACORN gang consists of various subsets including Gas Team, Baby Gas Team, and ACORN MOB. Gang members associated with the Gas Team will also represent ACORN. Acorn gang claims territory in West Oakland between 14th Street (to the north), 7th Street (to the south), Union Street (to the west), and Market Street (to the east) and includes the ACORN Housing Projects/City Towers (on 8th Street, 7th Street, and Market Street). Drugs including but not limited to heroin, cocaine, marijuana, and Robitussin with Codeine ('Syrup') are all sold within ACORN gang turf. ACORN gang members will configure their fingers into an 'A' to symbolize and represent ACORN. Gang members identify themselves with a moniker in order to prevent law enforcement, rival gang members, or

citizens in the community from knowing their true identity in the event the gang member was involved in a crime. The ACORN gang is a well known street gang in the City of Oakland. Up until several years ago, ACORN gang had a strong alliance with another West Oakland gang known as Ghost Town. Some factions within Ghost Town include Circle Boyz and P-Team. However, after an incident in June 2008, ACORN gang and Ghost Town began to feud and [this] resulted in ongoing shootings/attacks in rival gang territories. Currently, the ACORN gang's main rivals are the Lower Bottoms and Ghost Town Gangs of West Oakland."

The remaining gang evidence included appellant's own statement to the police that he was from Acorn Towers, and that the Acorn neighborhood had a longstanding gang rivalry with Ghost Town. Evans and Manning testified that appellant was part of Gas Team. In addition, the prosecution introduced 12 photographs of appellant with other Gas Team and Baby Gas members, wearing gang attire and throwing gang signs, labeled with "AirItOut223s," "Gas Team," "Acorn," "the mob," "Fuck Ghost Town," and "Fuck the Bottoms." The trial court excluded another 54 photographs on the ground that they were repetitive and cumulative.

The jury was also shown a four-minute rap music video entitled "Party in the Jetz," featuring appellant as the vocalist (self-identified in the video as "Air It Out"). The video was posted on the Internet by "Airitout223s" in April 2010. Its visual content consisted primarily of photographs of guns, ammunition, and money, as well as photograph depicting appellant, along with other people known to be Gas Team members, throwing gang signs and wearing gang attire. The lyrics included threats against Ghost Town and references to shooting and killing people, such as "You slide through 8th Street and get your whole shit whacked."

### E. Telephone Calls from Jail

After appellant was arrested, while he was in jail awaiting trial, he made numerous telephone calls to his mother and to various friends. The telephone calls were tape recorded and transcribed. The trial court reviewed the calls, and permitted the prosecution to admit about four hours' worth of tape recordings into evidence. The calls

8

were not played to the jury all at once, but rather interspersed with live testimony at convenient points during the trial.

The content of the calls included: (1) appellant's discussions with his mother about handling and disposal of a gun, which they referred to euphemistically as an "iPod," as well as an apparent tax fraud scheme; (2) discussions about making arrangements to populate the courtroom audience at appellant's preliminary hearing with gang members known to Evans, in order to intimidate the latter into changing his testimony; (3) comments on the evident success of the effort to intimidate Evans at the preliminary hearing; (4) references to physical conflicts at the jail between appellant and members of Ghost Town who were incarcerated with him; (5) appellant's admission that he had been "on the run . . . out of state" after the murders; (6) appellant's requests to be sent photographs of him and his friends, but with the gang signs obscured; (7) appellant's advice to two of his gang associates to "stay tucked for a minute" because the police had photographs of them in appellant's company; (8) numerous instances of appellant repeatedly urging people to assault Manning, or to instruct others to do so, in order to discourage or prevent Manning from testifying at appellant's trial, as well as inquiries about whether such assaults had occurred yet; and (9) discussions about appellant's desire to arrange the copying and distribution of partial transcripts of Manning's statements to the police, in order to motivate gang members to take revenge on her for implicating them in gang activities.[6]

### F. Proceedings in the Trial Court

On December 20, 2011, appellant was charged by information with two counts of first degree murder (Pen. Code, § 187, subd. (a)[7]), with gun use enhancement allegations

---

[6] While appellant was in jail, a search of his cell revealed that he had a copy of Manning's statement, from which several pages were missing.

[7] All further statutory references are to the Penal Code unless otherwise noted.

9

as to each count. (Former §§ 12022.5, subd. (a); 12022.53, subds. (b), (c), (d), (g); 12022.7, subd. (a).[8]) Appellant's jury trial began on May 4, 2012.

On June 19, 2012, the jury convicted appellant of both counts of first degree murder, and returned true findings on all the gun use enhancement allegations. On September 21, 2012, the trial court sentenced appellant to two consecutive terms of 25 years to life for the murders, plus two consecutive terms of 25 years to life for the gun use enhancements (§ 12022.53, subd. (d)), for a total term of 100 years to life. Appellant filed a notice of appeal the same day.

## III.

## DISCUSSION

### A. Admission of Excessive Gang Evidence

Although appellant was not charged with any gang-related crime or enhancement, evidence of appellant's association with a gang hostile to that of the victims was plainly relevant to show appellant's motive for the murder. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 655 (*McKinnon*) [evidence of gang affiliations admissible to establish motive and intent].) In addition, evidence of appellant's requests that his gang associates intimidate two of the prosecution's key witnesses, Manning and Evans, was relevant to those witnesses' credibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 287-288; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368 (*Olguin*).) Indeed, appellant implicitly concedes that the prosecution was entitled to introduce *some* evidence regarding appellant's gang affiliation and the witness intimidation efforts of his associates.

Appellant argues, however, that the prosecution should not have been permitted to "inundate" the jury with gang evidence and make it a focus of the case, so as to "paint[] a

---

[8] In 2010, the Legislature "reorganize[d] without substantive change the provisions of the Penal Code relating to deadly weapons." (Legis. Counsel's Dig., Sen. Bill No. 1080, 10 Stats. 2010 (2009–2010 Reg. Sess.) Summary Dig., pp. 4137–4138.) The new statutes became operative January 1, 2012, after the information in the present case was filed. All further references to former Penal Code sections are to these statutes as they read before the reorganization.

picture of [appellant] as an unapologetic 'gang banger,' readily disposed to committing violent crimes." As appellant acknowledges, our standard of review on this question is abuse of discretion, the same standard that applies on review of Evidence Code section 352 issues generally. (*Olguin*, *supra*, 31 Cal.App.4th at p. 1369 ["The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason."]; see generally *People v. Thomas* (2012) 53 Cal.4th 771, 806 ["Evidence Code section 352 gives the trial court discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . .' A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner. [Citations.]"].)

In assessing appellant's contention, we note that the trial court devoted a significant amount of pretrial hearing time to determining the nature and extent of the gang related evidence that would be admitted. While engaged in that process, the court expressly acknowledged its duty to balance the probative value of the evidence against its prejudicial and potentially inflammatory effect, and excluded the majority (53 out of 65) of the gang member photographs that the prosecution sought to admit, as well as a video about the Baby Gas gang in which Evans played a prominent role. Thus, the record affirmatively demonstrates that the trial court exercised its discretion in a thoughtful and considered fashion.

Appellant argues that the trial court nonetheless abused its discretion. In support of this argument, appellant cites *McKinnon*, *supra*, 52 Cal.4th at pages 653-656 as holding that in a case that does not involve gang enhancement allegations, the extent of the gang evidence should be limited. *McKinnon* was a capital case in which the defendant was charged with two murders. Circumstances suggested that the second murder was motivated by the defendant's gang membership, but the first murder was committed for no apparent reason. (*Id.* at p. 620.) Even though the defendant was not charged with any gang enhancements, the Supreme Court held that evidence of the

defendant's gang membership and activities was properly admitted as showing the motive for the second murder, and that its irrelevance to the first murder did not require the trial court to sever the two cases. (*Id.* at pp. 629-632, 655.)

*McKinnon* also rejected the defendant's contention that the gang evidence lacked foundation. (*McKinnon*, *supra*, 52 Cal.4th at pp. 655-656.) In that context, the court noted that "the gang evidence was a relatively minor component of the prosecution's case, and was not unduly inflammatory," and that it "did not emphasize the general violent nature of gang activity or suggest that the defendant's gang membership predisposed him to violent crimes, but instead focused narrowly on the prosecution's theory" that the second murder was gang-motivated. (*Id.* at p. 656.) The court did *not*, however, hold that these attributes of the gang evidence were a necessary precondition for its admissibility.

*McKinnon* may stand for the proposition that in a case not involving gang charges, gang evidence is less objectionable or less prejudicial if it is limited in extent and narrowly focused. But the Supreme Court did not hold that the evidence *must* meet these criteria in order for its admission to fall within the ambit of the trial court's discretion. The gang evidence in the present case, like that held properly admitted in *McKinnon*, "did not emphasize the general violent nature of gang activity." (*McKinnon*, *supra*, 52 Cal.4th at p. 656.) Only the penultimate sentence in the gang stipulation referred to *violent* crime, and although the video included images of guns, as well as lyrics referring to violent crime, neither the photographs nor the video actually depicted any violent acts.

Appellant also cites *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*) in support of his argument that the trial court admitted excessive gang evidence. In *Albarran*, the defendant and another man repeatedly fired guns into an occupied home. The defendants did not know the inhabitants of the house, and there was no apparent motive for the crime. The occupants of the home were not rival gang members, and there was no evidence that the defendant or his companion had announced themselves as gang members in connection with the shooting, or that the gang had publicly taken credit for it. (*Id.* at p. 227.) Nonetheless, a gang enhancement was alleged, on the theory that the

12

purpose of the shooting was to enhance the defendant's status within the gang to which the defendant admitted belonging.

At the hearing on the defendant's motion to exclude the evidence, the prosecutor admitted that he had no evidence of a gang connection or gang motive for the crime, other than the opinion of a gang expert. (*Albarran*, *supra*, 149 Cal.App.4th at pp. 217-219.) Nonetheless, the trial court denied the defendant's motion to exclude the evidence. At the defendant's trial, the prosecution introduced "extremely inflammatory gang evidence . . . , which had no connection to these crimes. The prosecution presented a panoply of incriminating gang evidence, which might have been tangentially relevant to the gang allegations, but had no bearing on the underlying charges." (*Id.* at p. 227.) The jury convicted the defendant, and found the enhancement allegations true. The trial judge granted the defendant's motion for new trial on the ground that the gang enhancement allegations were not supported by sufficient evidence, and dismissed those allegations, but declined to order a new trial on the underlying charges, based on the view that the defendant would have been convicted even if the gang evidence had not been admitted. (See *id.* at p. 226.)

On appeal, a divided court reversed, and remanded for a new trial. The majority characterized the case as "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." It explained that "[g]iven the nature and amount of th[e] gang evidence at issue, the number of witnesses who testified to [the defendant's] gang affiliations and the role the gang evidence played in the prosecutor's argument, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict." (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.)

In contrast to the situation in *Albarran*, *supra*, 149 Cal.App.4th 214, in the present case there was ample evidence that the shooting *was* gang-related, including appellant's own statements to the police and to Manning. Accordingly, unlike in *Albarran*, where "the prosecution did not prove that th[e] gang evidence had a bearing on the issues of intent and motive" (*id.* at p. 230), the gang evidence here was demonstrably relevant to

13

prove appellant's motive and intent in committing the murders. (Cf. *People v. Hunt* (2011) 196 Cal.App.4th 811, 817-818 [gang expert's testimony properly admitted where charged robberies were alleged to have been committed for benefit of gang; distinguishing *Albarran*].)  Moreover, the gang evidence introduced here was nowhere near as prejudicial as that introduced in *Albarran*, which included lengthy testimony about the crimes of appellant's fellow gang members, their threats to kill police officers, and references to the Mexican Mafia.  (*Id.* at pp. 227-228.)  Thus, *Albarran* is readily distinguishable.

Appellant also relies on *People v. Bojorquez* (2002) 104 Cal.App.4th 335 (*Bojorquez*).  In *Bojorquez*, the defendant was charged with robbery and false imprisonment, with firearm enhancements.  The charges arose from an incident that was not alleged to have been gang-related; the only apparent motive was to acquire the victim's jewelry and money.  (See *id.* at pp. 337-340.)  On direct examination, the defendant admitted to being a gang member in the past, but testified that he had ceased engaging in gang activities several months before the events from which the charges arose.  He called two defense witnesses who corroborated various aspects of his exculpatory version of the events leading to his arrest.  (*Id.* at p. 340.)  In rebuttal, the prosecution called a police officer to testify as an expert on the local gangs.  The officer described various gangs, enumerated their criminal activities, explained that their "code" prohibited them from testifying against other gang members, and described their practice of retaliating violently against people who failed to comply with that code.  The jury was instructed that the evidence regarding gangs could be considered only for the limited purpose of showing bias on the part of the witnesses.  (*Id.* at pp. 340-342.)

On appeal, the court held the trial court did not abuse its discretion in allowing the police officer to testify that the defendant had, in the past, admitted to him that he was in the same gang as one of the defense witnesses.  This evidence impeached the defendant's testimony and that of the witness, and was not unduly prejudicial in light of the other evidence of their joint gang membership.  (*Bojorquez, supra*, 104 Cal.App.4th at pp. 342-343.)  The court went on to hold, however, that the evidence regarding the ethnic

14

composition, criminal activities, and violent witness intimidation practices of the local gangs should have been excluded under Evidence Code section 352, as its "probative value . . . was minimal, if not nonexistent" (*id.* at p. 343), and its "prejudicial tendency . . . [was] plain, and significant" (*id.* at p. 344), particularly in that the police officer testified that gang members habitually engaged in robbery, the very crime with which the defendant was charged. (*Id.* at pp. 343-345.)

*Bojorquez*, *supra*, 104 Cal.App.4th 335 is distinguishable on its facts. The prosecution in *Bojorquez* did not allege that the underlying crime with which the defendant was charged was gang-related or gang-motivated, and there was no evidence that it was. The only purpose for which the evidence was admissible, therefore, was to impeach the defendant and his defense witness. The police officer's testimony regarding the reprehensible criminal activities of local gang members was therefore both irrelevant to that purpose and highly prejudicial. Here, on the other hand, the prosecution did seek to prove that gang rivalry, as well as appellant's desire for credibility within his gang, provided the motive for appellant's otherwise inexplicable action of shooting and killing two men who were sitting in a parked car.

In the present case, the only specific piece of gang-related evidence that appellant identifies as having been particularly prejudicial was appellant's "Party in the Jetz" rap video. Appellant contends its admission was particularly prejudicial in the absence of any explanation of "[t]he exaggerated nature of this genre of music." We find it unlikely that a jury composed of Alameda County residents in the year 2012 would be so unfamiliar with the "gangsta rap" genre as to take the video's lyrics at face value, as appellant contends they may have done. To the extent appellant is contending that a limiting instruction should have given specifically regarding the video, or that he should have been permitted to present evidence explaining it in its cultural context, he has forfeited those contentions by failing to assert them at trial. (*People v. Chism* (2014) 58 Cal.4th 1266, 1292-1293.)

In any event, appellant has not borne his burden of establishing that he was prejudiced by the admission of the video, either standing alone or when considered with

15

the other properly admitted evidence. Appellant's briefs on appeal attempt to portray the case as a close one, with the only direct evidence that appellant was the shooter being McQuirter's testimony identifying appellant solely by his unusual walking gait. In so doing, appellant ignores the evidence of his text messages and posts on social media in which he *admitted* killing Jackson and Hampton,[9] as well as the GPS evidence showing appellant was at the scene at the relevant time; the presence of his fingerprints on the victims' car; and the video showing him wearing Jackson's medallion after the murders. Given this evidence, it is clear beyond a reasonable doubt that a rational jury would have convicted appellant even if the "Party in the Jetz" video had not been admitted.[10]

### B. Trial Counsel's Agreement to Gang Stipulation

While contending that his conviction should be reversed due to the admission of excessive gang-related evidence, appellant at the same time complains that his trial counsel rendered ineffective assistance by agreeing to enter into the gang stipulation. "To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. [Citations.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 288.) Where the record affirmatively discloses a reasonable tactical basis for a decision made by a criminal defendant's trial counsel, we defer to that decision, and apply a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*People v. Stanley* (2006) 39 Cal.4th 913, 954.)

Here, it is evident from the record that appellant's trial counsel agreed to the gang stipulation in order to obviate the need for the prosecution to present the testimony of a

---

[9] As explained *post*, we conclude this evidence was properly admitted.

[10] Appellant contends that the admission of the gang evidence violated his due process rights, and that the applicable test for harmless error is therefore that established in *Chapman v. California* (1967) 386 U.S. 18, rather than the more lenient standard under *People v. Watson* (1956) 46 Cal.2d 818. Because we find the error harmless even under the *Chapman* standard, we need not and do not decide which standard applies.

16

police gang expert—testimony that in all likelihood would only have *added* to the quantum of evidence regarding the nature and activities of appellant's gang. The very same cases appellant cites in support of his excessive gang evidence argument provide vivid examples of the damaging nature of gang expert testimony. (See, e.g., *Albarran*, *supra*, 149 Cal.App.4th at pp. 227-228; *Bojorquez*, *supra*, 104 Cal.App.4th at pp. 340-341.) By comparison, the content of the gang stipulation to which appellant's counsel agreed was relatively benign, and likely to have made a less vivid impression on the jury than the same facts presented in the form of expert testimony. Moreover, by agreeing to have the background facts about appellant's gang introduced in the form of a stipulation rather than through testimony, appellant's trial counsel was in a better position to influence the wording and scope of that information. Accordingly, we are not persuaded that counsel's tactical decision to agree to the stipulation constituted ineffective assistance of counsel.

For much the same reasons, we also conclude that even if trial counsel had rendered ineffective assistance in agreeing to the gang stipulation, appellant has not demonstrated that he was thereby prejudiced. In arguing ineffective assistance of counsel, a "defendant must affirmatively demonstrate prejudice; it is not sufficient for the defendant to show the error had some ' "conceivable effect" ' on the outcome of the proceeding. [Citation.]" (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1325, citing *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) Here, had trial counsel not entered into the gang stipulation, the jury would have been exposed to *even more* evidence about appellant's gang and its activities than the facts included in the stipulation; moreover, that evidence would have been introduced in the more salient and memorable form of expert testimony by a police officer. Appellant therefore cannot show any reasonable likelihood that the outcome of his trial would have been more favorable had his trial counsel not agreed to the gang stipulation.

## C. Admission of Excessive Jail Call Evidence

As already noted, prior to appellant's trial, the prosecution sought to introduce tape recordings and transcripts of numerous telephone calls that appellant made while in

jail awaiting trial (the jail call evidence). Appellant's trial counsel objected to the admission of the jail call evidence under Evidence Code section 352 on the ground that it was more prejudicial than probative. The trial court reviewed the recordings at length, in the presence of both counsel, and solicited counsel's comments on their probative import and potential prejudicial effect. At the end of this process, the trial court excluded a portion of the jail call evidence, but concluded that much of it—approximately four hours of tape recordings, and the corresponding transcripts—was relevant to show consciousness of guilt, repeated efforts to arrange for the intimidation of witnesses (particularly Manning and Evans), and admissions concerning the murder weapon. Additional portions of the calls were held admissible to provide context for the relevant portions. The trial judge expressly found that the probative value of the admitted portions of the jail call evidence outweighed their prejudicial effect.

Appellant contends that the trial judge erred in permitting the prosecution to introduce an excessive amount of jail call evidence, and that the error violated his right to due process and a fair trial.[11] He acknowledges that evidence a defendant made threats against a witness is admissible as relevant to the witness's credibility. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1084; *People v. Burgener* (2003) 29 Cal.4th 833, 869.) He contends, however, that the trial court erred in admitting far more evidence than was necessary to establish appellant's intimidation efforts. He also contends it was error to admit the portions of the jail call evidence that implicated appellant in other uncharged crimes and bad acts, such as fighting while in jail, tax fraud, and brandishing a firearm.

---

[11] On appeal, respondent expressly concedes that appellant's trial counsel's objection was sufficient to preserve appellant's right to argue that the trial court erred in determining that the jail call evidence was more probative than prejudicial. We note also that an objection to the admission of evidence based on Evidence Code section 352 is sufficient to preserve for appeal a defendant's argument that the admission of the same evidence resulted in error so serious as to violate the defendant's due process rights. (*People v. Partida* (2005) 37 Cal.4th 428, 433-439.) We will assume, for purposes of this appeal, that appellant's trial counsel also preserved appellant's objections to the portions of the jail call evidence that implicated appellant in uncharged bad acts.

18

As already noted, *ante*, we generally review a trial court's rulings on objections based on Evidence Code section 352 for abuse of discretion. (*People v. Thomas*, *supra*, 53 Cal.4th at p. 806.) Given that standard of review, we are not persuaded by appellant's arguments. The record makes clear that the trial court engaged in precisely the weighing and balancing process contemplated by Evidence Code section 352 before deciding which portions of the jail call evidence to admit. The sheer number of jail calls during which appellant discussed witness intimidation was relevant to show the persistence and determination with which appellant sought to intimidate witnesses, and thus was relevant to the strength of the impact of appellant's efforts on the target witnesses' testimony. Other portions of the calls demonstrated appellant's strong loyalty to his gang, and his willingness to engage in physical attacks on members of rival gangs—facts that were clearly relevant to establishing appellant's motive for the charged murders. Other portions of the jail call evidence were relevant to authenticate appellant as the author of the evidence drawn from electronic communications and posts on social media. For all of these reasons, we are not persuaded that the trial judge abused his discretion in admitting the jail call evidence, either with respect to any of the individual calls or with respect to the overall quantity of this evidence.

## D. Failure to Object to Inadequately Authenticated Electronic Evidence

### *1. Background*

The prosecution's evidence included the following items derived from electronic messages or material posted on social media: (1) Manning's email transcribing and compiling text messages Manning received from appellant after the murders (the text message email); (2) material posted on a Facebook account maintained under the name "Airitout Gasteam" (the Facebook posts); and (3) photographs posted on the photo

sharing site Photo Bucket, in an account belonging to appellant (the Photo Bucket photographs).**[12]**

## 2. *Analysis*

"Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) " 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*People v. Sarpas* (2014) 225 Cal.App.4th 1539, 1571.)

With regard to the text message email, Manning, appellant's former girlfriend, testified at appellant's preliminary hearing regarding its genesis. She explained that she spoke with appellant on the telephone while he was in Seattle; he told her he would text her shortly; and she soon received electronic messages from an account that she knew belonged to appellant. She copied and pasted her text message conversation with appellant into an email, without altering the contents of the messages. She identified the printout of this email as an accurate representation of the message exchange.

Manning's personal participation in the text message exchange and in the creation of the text message email, together with her knowledge of appellant's social media accounts and the circumstances surrounding the text message exchange, permitted the prosecution to lay a sufficient foundation for the authenticity of the text message email through Manning's testimony. In our view, this constitutes an adequate foundation for the introduction of the text message email into evidence—subject, of course, to

---

**[12]** The prosecution also introduced two videos posted on YouTube: (a) the "Party in the Jetz" rap video, and (b) a video showing appellant in Seattle wearing a distinctive medallion that belonged to Jackson and which could not be located after his death (the Seattle video). Appellant's opening brief does not question his trial counsel's failure to object to the authenticity or admissibility of the Seattle video, or to the authenticity of the "Party in the Jetz" rap video.

appellant's right to cross-examine Manning regarding her account of how the document was generated, or to introduce other evidence casting doubt on its veracity.[13]

Based on Manning's testimony at the preliminary hearing, appellant's trial counsel was aware that the prosecution had sufficient evidence to authenticate the text message email. It is clear from the record that trial counsel relied on this fact in arriving at a tactical decision not to put the prosecution to its proof. That tactical decision did not constitute ineffective assistance of counsel. (Cf. *People v. Diaz* (1992) 3 Cal.4th 495, 559-560 [failure to object to introduction of evidence on chain of custody grounds did not constitute ineffective assistance of counsel where prosecution would have been able to establish chain of custody if required to do so].) Appellant's trial counsel's tactical decision not to object on authenticity grounds to the admission of the text message email therefore was not ineffective assistance of counsel.

The Facebook posts were authenticated at trial by a stipulation that Dorgan McDade, a relative of Hampton's, if called as a witness, would testify that he printed the pages out from a Facebook account belonging to appellant under the name Airitout Gas Team. Similarly, the Photo Bucket photographs were authenticated by a stipulation that a prosecution investigator downloaded them on a certain date from an account on the Photobucket.com website maintained by someone using the name "GasTeamNick." Both of these stipulations were based on extensive information provided in the prosecutor's in limine motion regarding the origin and authenticity of these documents, including statements appellant made in his telephone calls from jail that tended to show the material was genuine. For the reasons articulated above with respect to the text message email, we are not persuaded that appellant's trial counsel's rendered ineffective assistance in

---

[13] Appellant argues that the text messages could have originated from someone other than appellant, or that Manning could have changed their content when she copied them into the text message email. Manning testified that neither of these things occurred, however. The record reflects that appellant's trial counsel attempted to find an expert who could cast doubt on this testimony, but apparently was unable to do so.

making a tactical decision not to require the prosecution to present its authenticating information to the jury.

### E. Trial Counsel's Failure to Object to Improper Argument

During his closing argument, appellant's trial counsel argued at length that Evans's testimony about appellant being the shooter was untrustworthy for a number of reasons. After questioning how Evans could have seen what he claimed to have seen from the location where he claimed to have been, counsel remarked that Evans was "as likely a shooter in this case as anybody else," and suggested that Evans told the police he saw appellant shoot the victims in order to deflect suspicion from himself. Later in his closing argument, appellant's counsel suggested it would also be reasonable for the jury to believe the shooter was Dionte "Birdman" Houff, a member of appellant's gang whose fingerprints, like those of appellant, were found on the victims' car. As an explanation of why appellant lied to the police about his whereabouts at the time of the shooting, trial counsel offered the possibility that appellant did not want to be asked to identify the shooter.

In rebuttal, the prosecutor professed surprise at appellant's suggestion that Evans was the shooter, particularly when appellant had stated during one of the jail calls that Evans "ain't have nothing to do with it." The prosecutor questioned how appellant could know Evans had nothing to do with the killings unless appellant himself was the shooter. He added, "But I guess [Evans] is now the shooter, and/or possibly Dionte Houff , he was the shooter, and *apparently* [*appellant*] *just doesn't want to tell you*." (Italics added.)

Appellant's trial counsel did not object to this line of argument. Appellant now contends this omission constituted ineffective assistance of counsel, because the prosecutor's assertion that "[appellant] just doesn't want to tell you" the real identity of the shooter constituted an improper comment on appellant's exercise of his Fifth Amendment right not to testify. (See *Griffin v. California* (1965) 380 U.S. 609.)

Respondent counters that (1) because the record is silent as to trial counsel's reasons for not objecting, the ineffective assistance claim is not cognizable on direct appeal; (2) the prosecutor's brief remark constituted a proper comment on the state of the

22

evidence rather than an improper comment on appellant's decision not to testify, and thus any objection would have been futile; and (3) appellant has not borne his burden of showing prejudice from his trial counsel's failure to object.

Respondent's first argument is persuasive, so we need not and do not reach the others. Where a criminal defendant's trial counsel may have had a reasonable tactical basis to refrain from making an objection, and the record on appeal is silent on the issue, a claim that the decision constituted ineffective assistance of counsel is not cognizable on direct appeal. Our Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citations.]". (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) " 'Because we accord great deference to trial counsel's tactical decisions, counsel's failure to object rarely provides a basis for finding incompetence of counsel.' [Citation.] Such claims must be rejected on direct appeal if the record does not affirmatively show why counsel failed to object and the circumstances suggest counsel could have had a valid tactical reason for not objecting. [Citation.]" (*People v. Jones* (2009) 178 Cal.App.4th 853, 860.)

Here, the prosecutor's assertedly improper argument took the form of a brief, passing remark. Thus, it would have been reasonable for appellant's trial counsel to conclude that objecting to it would only backfire, by drawing the jury's attention to it. Moreover, the prosecutor's remark was not entirely prejudicial in its effect; it alluded obliquely to appellant's failure to testify, but it also reminded the jury of appellant's counsel's argument that there were at least two other people who could have committed the murders. This presents an additional possible tactical reason for counsel's decision to let the remark pass.

In short, on the record before us, we cannot eliminate the probability that appellant's trial counsel had valid tactical reasons for not objecting. Accordingly,

23

appellant's ineffective assistance claim is not cognizable on direct appeal. As we have also concluded that the trial court did not commit any reversible evidentiary error, we also reject appellant's contention that the cumulative effect of the errors at his trial deprived him of due process and a fair trial under the California and federal constitutions.

## F. Unconstitutional Sentence

### 1. Background

The trial court sentenced appellant to a total term of 100 years to life, consisting of four consecutive terms of 25 years to life. Respondent concedes that this is the functional equivalent of life in prison without parole, because it means appellant would not even become eligible to be considered for parole until he reached the age of 118. (Cf. *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) [sentence with parole eligibility date outside juvenile offender's natural life expectancy deprives offender of "meaningful opportunity to demonstrate . . . rehabilitation and fitness to reenter society in the future," and thus violates Eighth Amendment when imposed for non-homicide offense].) We will refer to a sentence that is the functional equivalent of life in prison without parole as a de facto LWOP sentence.[14]

Appellant argues that because he was a juvenile at the time of the murders and he received a de facto LWOP sentence, his sentence is unconstitutional under *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), which held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," including those who commit homicides. (*Id.* at p. ___ [132 S.Ct. at p. 2469].) As appellant acknowledges, *Miller* does not hold that life without

---

[14] We accept respondent's concession that appellant's sentence is a de facto LWOP. Thus, we need not consider appellant's exact life expectancy in order to address this issue. On July 3, 2013, we granted appellant's request for judicial notice of a government vital statistics report bearing on appellant's life expectancy, but without determining its relevance. Given respondent's concession, the document is not material to the issues presented by this appeal.

parole (LWOP) sentences can *never* be imposed on juvenile homicide offenders.[15] Nonetheless, *Miller* does hold that under the Eighth Amendment, such sentences must be discretionary, and may be imposed only if the sentencing court, after considering all the relevant information,[16] determines that the case involves one of the " 'rare juvenile offender[s] whose crime reflects irreparable corruption.' [Citations.]" (*Ibid.*)

Since June 2012, when the United States Supreme Court decided *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455], the California appellate courts have relied on *Miller* on a number of occasions in reversing de facto LWOP sentences imposed on juvenile offenders. For example, in *People v. Argeta* (2012) 210 Cal.App.4th 1478, the court held that the Eighth Amendment precluded sentencing a defendant convicted on an aiding and abetting theory of committing murder at the age of 15 to an aggregate minimum sentence of 100 years, which was concededly a de facto LWOP. In *People v. Lewis* (2013) 222 Cal.App.4th 108, Division Five of this court held that a prison sentence totaling 115 years to life for two rapes and a murder was a de facto LWOP, and the juvenile defendant therefore had to be resentenced in light of *Miller*. The court directed the trial court to impose a sentence that would result in a parole eligibility date within the defendant's expected lifetime, unless the trial court found that the defendant's "offenses reflect[ed] his irreparable corruption within the meaning of *Miller* [citation]." (*Id.* at pp. 117-123.)

Most recently, after the completion of briefing in the present case, our Supreme Court held that in order to pass constitutional muster, the California statute regarding the penalty for special circumstances murder committed by a 16- or 17-year-old (§ 190.5,

---

**15** Previously, in *Graham v. Florida* (2010) 560 U.S. 48, the Supreme Court held that the Eighth Amendment categorically precludes the imposition of an LWOP sentence on a juvenile who commits any crime other than homicide.

**16** The *Miller* opinion sets forth a list of factors related to the age of a juvenile offender that the trial court must consider before imposing an LWOP sentence, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; whether "the family and home environment that surrounds" the juvenile is "brutal and dysfunctional"; "the way familial and peer pressures may have affected" the juvenile; and "the possibility of rehabilitation." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468].) We will refer to these characteristics as the *Miller* factors.

subd. (b) (§ 190.5(b)) must be construed to permit the sentencing judge to impose either LWOP or 25 years to life, in the court's discretion, without any presumption in favor of an LWOP sentence. (*People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*).) After the California Supreme Court issued its opinion in *Gutierrez*, we requested and received letter briefs from both parties regarding the implications of the opinion for the issues presented by this appeal.

*Gutierrez* directly addressed one issue presented by this appeal. The Supreme Court held that the requirement that trial courts conduct an individualized inquiry into the *Miller* factors before imposing an LWOP sentence on a juvenile offender is not obviated by a recently enacted statute (§ 1170, subd. (d)(2)) that permits a person serving an LWOP sentence for a crime committed as a juvenile to petition for resentencing after serving at least 15 years. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1387.) In light of this aspect of the *Gutierrez* court's analysis, respondent's post-*Gutierrez* letter brief has withdrawn respondent's earlier argument that appellant's challenge to his sentence is mooted by section 1170, subdivision (d)(2). We appreciate and accept this concession.

*Gutierrez*, *supra*, 58 Cal.4th 1354, involved juvenile offenders expressly sentenced to LWOP for special circumstances murder under section 190.5(b). The present case is arguably distinguishable, in that appellant received a de facto LWOP sentence rather than an express one. Our Supreme Court currently has pending before it a pair of cases presenting (among other issues) the question whether it violates the Eighth Amendment for a trial court to sentence a juvenile homicide defendant to a de facto LWOP without first considering the *Miller* factors. (*In re Alatriste*, review granted Feb. 19, 2014, S214652; *In re Bonilla*, review granted Feb. 19, 2014, S214960.)

Here, respondent's brief cites *Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469], and *Caballero*, *supra*, 55 Cal.4th at pages 268-269, for the proposition that "there is no per se bar on sentencing juvenile murderers to [de facto LWOP], *so long as* the sentencing scheme does not mandate LWOP and *the trial court considers mitigating factors* related to the defendant's age." (Original italics omitted; italics added.) This summary of the law appears to acknowledge that *Miller* does indeed bar a trial court from

26

sentencing a juvenile homicide defendant to a de facto LWOP without considering the *Miller* factors. We agree, and in light of respondent's apparent concession on the point, we need not await the California Supreme Court's definitive resolution of this issue in order to adjudicate this appeal.

While respondent does not argue that a de facto LWOP sentence for juvenile homicide is constitutional even if the trial court fails to consider the *Miller* factors, respondent does offer two alternative arguments for rejecting appellant's challenge to his sentence in the present case. First, respondent argues that the claim was forfeited by the failure of appellant's trial counsel to object to the sentence on these grounds at the time it was imposed. Second, respondent argues that there is no need for a remand, because the law presumes, and the record reflects, that the trial court was aware of the scope of its discretion in sentencing appellant; considered all the *Miller* factors; and did not abuse its discretion.

### *2. Forfeiture*

Unlike the defendants in *Gutierrez*, *supra*, 58 Cal.4th 1354, appellant was sentenced several weeks *after* the opinions had issued in both *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455], and *Caballero*, *supra*, 55 Cal.4th 262. Respondent argues that appellant's trial counsel therefore should have known about these cases, and should have objected to appellant's sentence on the constitutional grounds appellant now puts forward. Because no such objection was made, respondent contends appellant has forfeited his right to challenge his sentence. Appellant counters that if the objection was forfeited, then he received ineffective assistance of counsel.

We have discretion to resolve the issue on the merits despite appellant's failure to object to his sentence in the trial court. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6 [except as to admission or exclusion of evidence, appellate courts are generally not prohibited from reaching a question that has not been preserved for review by a party]; *In re Travis J.* (2013) 222 Cal.App.4th 187, 194-195; see generally *In re Sheena K.* (2007) 40 Cal.4th 875, 880-889.) In light of the evolving state of the relevant law; the constitutional dimensions of appellant's challenge to his sentence; and the

likelihood of a future ineffective assistance of counsel claim if we were to deem the issue forfeited, we conclude it is appropriate for us to reach the merits of this issue despite appellant's trial counsel's failure to raise it below.

### 3. Constitutionality of Appellant's Sentence

In *Gutierrez*, *supra*, 58 Cal.4th 1354, the California Supreme Court held that "*Miller* requires sentencing courts to undertake a careful individualized inquiry *before* imposing life without parole on juvenile homicide offenders. [Citation.]" (*Id.* at p. 1382, italics added, citing *Miller*, *supra*, 567 U.S. at pp. ___-___ [132 S.Ct. at pp. 2468-2469].) As the *Gutierrez* court reasoned, "it is doubtful that the potential to recall a[n] [LWOP] sentence based on a future demonstration of rehabilitation can make such a sentence any more valid than when it was imposed." (*Gutierrez*, *supra*, 8 Cal.4th at pp. 1386-1387.) Rather, the court interpreted *Miller* as requiring that "the sentencing authority must address th[e] risk of error [in a judgment of incorrigibility] by considering how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.' [Citation.]" (*Id.* at p. 1387, italics added by *Gutierrez*.)

This interpretation is reflected in the Supreme Court's discussion regarding the proper disposition of the two cases involved in *Gutierrez*, *supra*, 58 Cal.4th 1354. The court held that even though the trial courts in those cases "understood [they] had a degree of discretion in sentencing," their sentencing decisions were not made "with awareness of the full scope of discretion conferred by section 190.5(b) or with the guidance set forth in *Miller* and [*Gutierrez*] for the proper exercise of [their] discretion." (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1390-1391.) Because "the records [did] not 'clearly indicate[]' that [the trial courts] would have imposed the same sentence had they been aware of the full scope of their discretion," the Supreme Court remanded both cases for resentencing. (*Id.* at p. 1391.)

In the present case, respondent argues, both in its respondent's brief and in its post-*Gutierrez* letter brief, that such a remand is not necessary, because appellant was sentenced *after* the opinions had issued in both *Miller*, *supra*, 567 U.S. ___ [132 S.Ct.

2455], and *Caballero*, *supra*, 55 Cal.4th 262.  Thus, respondent contends, the trial court here may be presumed to have understood both the scope of its sentencing discretion and its obligation to consider the *Miller* factors in determining how to exercise that discretion.

It is true, as respondent points out, that the trial judge stated at the outset of the sentencing hearing that he had "read and considered the probation report."  It is also true that the probation report included a discussion of some facts pertinent to the *Miller* factors.  For example, the probation report disclosed that appellant's father died while incarcerated when appellant was about seven years old, and appellant never had a relationship with him.  The report also indicated that appellant stopped attending school after ninth grade, and was, by his own account, "a very slow learner."  In addition, appellant reportedly admitted using marijuana on a daily basis since the age of 15.

However, these facts were not given any particular prominence in the probation report, and were not expressly identified as facts that could militate against a de facto LWOP sentence under *Miller*.  Nor did the probation report address *all* of the potentially applicable *Miller* factors.  The prosecutor's pre-investigation memorandum to the probation department, which was included in the probation report, also did not mention either *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455], and *Caballero*, *supra*, 55 Cal.4th 262, or indicate that there might be any legal obstacle to imposing the recommended sentence of 100 years to life.  Thus, in our view, the trial judge's general statement that he had read and considered the probation report is not sufficient, in and of itself, to establish that he had conducted the requisite analysis of the *Miller* factors.

Respondent cites *People v. Gutierrez* (2009) 174 Cal.App.4th 515, in support of the argument that no remand is required here.  In that case, the defendant argued that because the felony of which he was convicted (battery on a custodial officer) was also defined as a misdemeanor in another statute, the trial court had discretion to sentence him as if he had been convicted of the misdemeanor.  The Court of Appeal concluded that even if the trial court in fact had such discretion—an issue it declined to reach—the defendant was not entitled to relief.  The court reasoned that "in light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory

29

discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion. [Citations.]" (*Id.* at p. 527.) The court went on to note that the trial court had found no mitigating circumstances and five aggravating circumstances, and had stressed the defendant's poor performance on probation and parole, and extended history of violence. Thus, the court found it clear from the record that even if the trial court had discretion to impose a misdemeanor sentence, and was aware of that discretion, it would not have exercised it in the defendant's favor. (*Ibid.*)

*People v. Gutierrez*, *supra*, 174 Cal.App.4th 515, does not persuade us that no remand is necessary here. In that case, the record was silent regarding whether the trial court understood the scope of its discretion, but there was ample evidence to support the conclusion that an affirmative exercise of the court's discretion would have led to the same result. The present case involves not merely a possible failure to advert to and exercise discretion, but the failure to undertake a *constitutionally mandated* analysis of the individual defendant's situation. Moreover, not only is there no evidence that the trial judge was aware of his constitutional obligations under *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455], and *Caballero*, *supra*, 55 Cal.4th 262, but there is also no evidence indicating whether or not the judge would have imposed a de facto LWOP sentence had he undertaken the required analysis.

As we have already noted, *ante*, the relevant law was in the process of evolving at the time appellant was sentenced, and has continued to do so since then. The applicability of the *Miller* factors to de facto (as opposed to express) LWOP sentences for juvenile offenders had only been settled law for about a month at the time appellant was sentenced. (See *Caballero*, *supra*, 55 Cal.4th 262.) In addition, it was only after appellant's sentencing that our Supreme Court interpreted the federal Constitution to preclude the application to juveniles of a presumption in favor of an LWOP sentence, even if rebuttable. (*Gutierrez*, *supra*, 58 Cal.4th 1354.) And, as previously mentioned, some issues relating to juvenile LWOP sentences are still awaiting further elaboration by the California Supreme Court. (*In re Alatriste*, *supra*; *In re Bonilla*, *supra*.) In our view,

this situation distinguishes *People v. Gutierrez*, *supra*, 174 Cal.App.4th 515, as well as the other cases relied upon by respondent for the proposition that the trial judge here should be presumed to have considered the *Miller* factors and exercised his discretion accordingly. (See also *Gutierrez*, *supra*, 58 Cal.4th at p. 1391 [remanding for resentencing because record did not clearly indicate that sentencing courts would have imposed same sentences if aware of full scope of their discretion].)

In short, whether due to the unsettled state of the law or to the failure of either counsel to direct the trial judge's attention to the issue, the record does not reflect any recognition or acknowledgment by the trial judge of his obligation under *Miller* not to impose a de facto LWOP sentence without making an express finding that appellant was one of the " 'rare juvenile offender[s] whose crime reflects irreparable corruption.' [Citations.]" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469].) Indeed, the trial judge did not discuss or even mention the rationale for his sentencing choices.[17] For these reasons, we are not prepared to presume, based on an entirely silent record, that the trial judge undertook the analysis required by *Miller*, *Caballero*, and *Gutierrez*. As those cases (particularly *Gutierrez*) make clear, that analysis must occur at the time of sentencing; the possibility that the defendant may be able to obtain an earlier parole hearing date in the future is not an adequate substitute. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1384-1387.) Accordingly, we conclude that appellant must be resentenced.

---

[17] During his pronouncement of sentence, the trial judge stated that appellant's sentence for Hampton's killing "has to be served consecutively" to his sentence for Jackson's killing. Appellant argues this indicates the trial judge did not believe he had any discretion to exercise regarding whether to make appellant's sentences concurrent or consecutive. We are not persuaded by this argument; the quoted phrase is ambiguous, and could have been the judge's way of announcing that he had *chosen* to impose consecutive sentences. Nonetheless, nothing in the record indicates that the judge considered the *Miller* factors before making that choice.

31

## IV.

## DISPOSITION

Appellant's conviction is affirmed. With respect to appellant's sentence only, the judgment is vacated, and the case is remanded for resentencing in accordance with the views expressed in this opinion, as they may be clarified or limited by future opinions of the California Supreme Court in the relevant cases now pending before it.

_____
RUVOLO, P. J.

We concur:

_____
RIVERA, J.

_____
HUMES, J.*

* Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.